UNITED STATES v. ROCKHILL & VIETOR ET AL. (No. 1992).[1]

1. CONSTRUCTION, PARAGRAPHS 5 AND 498, TARIFF ACT OF 1913—"CHEMICAL * * * COMPOUNDS"—"CHEMICALLY COMPOUNDED."

The term "chemical * * * compounds," in paragraph 5, tariff act of 1913, differs from the term "chemically compounded" in paragraph 498; and a given substance may not be a chemical compound within paragraph 5 but may perhaps be chemically compounded within paragraph 498.

[1] T. D. 38374 (38 Treas. Dec., 326).

2. Construction, Paragraph 5, Tariff Act of 1913—"Chemical * * * Compounds."

"A chemical compound necessarily implies not a mere mingling of components, but a chemical combination of them, resulting in their destruction as distinct entities and in the development by chemical reaction of a new substance possessing properties radically different from those of its constituent elements."—Strohmeyer *v.* United States (2 Ct. Cust. Appls., 285; T. D. 32035). Hydrogenated oil, oil whose hydrogen content has been increased chemically, this process resulting in changing the oil from a liquid to a solid at ordinary room temperatures without altering its essential character and qualities, is not a chemical compound within the meaning of that expression in paragraph 5, tariff act of 1913.

3. Evidence—Admission Against Interest.

In the trial of protests claiming merchandise not to be fish oil, invoice and entry descriptions of it as such are entitled to substantial evidential weight as being admissions against interest.

4. Evidence—Weight and Sufficiency.

In the trial of protests claiming certain hydrogenated oil not to be fish oil, the report of the appraiser that the oil was "unidentifiable" and the testimony of protestants' chemist that it was not possible to tell what kind of oil it originally was, is clearly outweighed by invoice and entry descriptions of it as fish oil coupled with the testimony of two chemists that their examinations furnished ground for the belief that the original oil was fish oil.

5. Construction, Paragraph 44, Tariff Act of 1913—"Oils."

Fluidity at ordinary room temperatures is not necessary to the meaning of the word "oils," in paragraph 44, tariff act of 1913.

6. Pleading—Protest—Evidence—Presumption in Favor of Collector.

A protest against an erroneous classification, making no correct claim, can not be sustained. The decision of the Board of United States General Appraisers sustaining it must be reversed and the collector's erroneous classification must stand.

7. Hydrogenated Fish Oil.

Fish oil which has been hardened by chemically increasing its hydrogen content, its essential characteristics remaining unchanged, is classifiable under paragraph 44, tariff act of 1913, as fish oil, and not under paragraph 5 as a chemical compound, or under paragraph 498 as miscellaneous, not chemically compounded grease, such as is commonly used in soap making or in wire drawing or for stuffing or dressing leather.

United States Court of Customs Appeals, April 10, 1920.

Appeals from Board of United States General Appraisers, G. A. 8260 (T. D. 38031).

[Reversed.]

*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.
*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for appellees.

[Oral argument Feb. 25, 1920, by Mr. Lawrence and Mr. Place.]

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

Martin, Judge, delivered the opinion of the court:

The merchandise in this case consists of small irregular-sized pieces of a white, oily material which resembles tallow, both in appearance

and to the touch. Two shipments were imported and are upon appeal, these having been separately invoiced and entered. In each invoice the merchandise was described as "Hardened oil (fish)"; while in each entry it was described both as "Hardened oil" and as "Fish oil."

The appraiser reported that the merchandise consisted of an unidentifiable oil which had been chemically treated, rendering it hard like ordinary tallow. He returned it for duty as a "chemical compound" not specifically provided for, at 15 per cent ad valorem under paragraph 5, tariff act of 1913.

The importers filed their protests against the classification and assessment. In both protests a claim was made for the free entry of the merchandise as a material commonly used in soap making and governed by paragraph 498 of the act; while in one of the protests an alternative claim was made for the assessment of the merchandise as fish oil at 3 cents per gallon, under paragraph 44 of the act. The protests contained other claims which are not now urged by the protestants.

The following is a copy of the several paragraphs in question:

*Dutiable list.*

5. Alkalies, alkaloids, and all chemical and medicinal compounds, preparations, mixtures, and salts, and combinations thereof not specially provided for in this section, 15 per centum ad valorem.

44. Oils, rendered: Sod, seal, herring, and other fish oil, not specially provided for in this section, 3 cents per gallon; whale oil, 5 cents per gallon; sperm oil, 8 cents per gallon; wool grease, including that known commercially as degras or brown wool grease, crude and not refined or improved in value or condition, one-fourth cent per pound; refined or improved in value or condition, and not specially provided for in this section, one-half cent per pound; lanolin, 1 cent per pound; all other animal oils, rendered oils and greases, and all combinations of the same, not specially provided for in this section, 15 per centum ad valorem.

*Free list.*

498. Grease, fats, vegetable tallow, and oils (excepting fish oils) not chemically compounded, such as are commonly used in soap making or in wire drawing, or for stuffing or dressing leather, not specially provided for in this section.

The protests were submitted upon testimony to the Board of General Appraisers, and the board in a majority opinion held that the merchandise was not a chemical compound as assessed, but was a material for soap making which responded to the descriptions contained in paragraph 498, supra, and accordingly was entitled to free entry. In support of this classification the board held in detail (1) that the merchandise was a grease, fat, or oil which was commonly used in soap making, (2) that it was not fish oil, and (3) that it was not chemically compounded. Upon these premises the board sustained the claim for free entry in the protests, and from this decision

the Government appealed.  Upon the present appeal, however, the Government does not dispute the board's finding that the merchandise is commonly used in soap making, but only the two other findings, namely, the findings that the merchandise is not fish oil and that it is not chemically compounded.  These are the issues, therefore, which now demand decision.

It is clearly established by the testimony that the present material came to its first estate as either a vegetable or an animal oil, using the latter term as comprehensive of both marine and land animals. The original oil was undoubtedly fluid at ordinary temperature, and it was brought to its present tallow-like consistency by means of the so-called process of hydrogenation.  In this treatment oil is first mixed with a finely divided nickel salt or oxide; it is then heated, generally by means of steam, in an atmosphere of hydrogen gas.  The nickel used in the operation does not unite either physically or chemically with the oil, unless in a negligible measure only, but its presence catalytically facilitates a chemical reaction whereby the oil, which already is composed in part of hydrogen, takes on a slightly increased percentage of that element.  The chemical symbol of the oil is accordingly changed by the operation, not that any new chemical element is added nor that any of the original elements are eliminated, but simply that the proportion of hydrogen in the processed oil is slightly increased.  As a result of this treatment the solidifying point of the oil is raised so that at ordinary room temperature it does not remain fluid but assumes a consistency like that of tallow, except that it is more brittle.  This change in the oil's consistency makes it possible to transport it more economically to this country, and incidentally improves it somewhat physically as a material for soap making.  Otherwise the general qualities or characteristics possessed by the oil before treatment do not seem to be affected by the operation.  It need hardly be said that the melting point of the oil is simply advanced to a higher temperature than that first appertaining to it, for of course it is not converted into a permanent solid. It does not appear that the oil when thus processed is deprived of the name of oil by the trade; it is called hardened or hydrogenated oil.  Its availability for its former uses is not impaired except of course for such uses as may require it to be fluid at ordinary temperatures.

As appears above, the merchandise thus described was classified and assessed by the collector as a chemical compound.  We think that this was erroneous.  It is true that the hydrogenation of the oil modified its chemical formula or symbol by a slight increase in the proportion of its constituent hydrogen, but on the other hand the essential character and qualities of the oil survived the operation, even though one of its characteristics was modified.  Hydrogen is

undoubtedly a chemical element, but the oil in question although of course composed of chemical elements could hardly itself be called a chemical, and the resultant product was, after all, simply and essentially the oil modified in one of its qualities, and it is far from being ejusdem generis with the substances which are enumerated in the chemical compound paragraph.

In the case of Strohmeyer *v.* United States (2 Ct. Cust. Appls., 285–287; T. D. 32035) this court said:

> As we have already observed, a chemical compound necessarily implies not a mere mingling of components, but a chemical combination of them, resulting in their destruction as distinct entities and in the development by chemical reaction of a new substance possessing properties radically different from those of its constituent elements.—McKesson *v.* United States (1 Ct. Cust. Appls., 213–216).

It may be noted that the term "chemical compound," which appears as an enumeration in paragraph 5, supra, differs from the term "chemically compounded," which appears as a modifying phrase in paragraph 498, supra, and a given substance may not be a chemical compound within the former paragraph, but may perhaps be "chemically compounded" within the purview of the latter paragraph. We may therefore say at this point that while we hold the present merchandise not to be a chemical compound, we do not hold that it has not been chemically compounded. Nor do we find it necessary to pass upon that subject in the present decision.

The remaining question in the case is whether the merchandise is fish oil, for if it is it would be excluded in express terms from the favor of paragraph 498, supra. This question is really twofold in character, for the importers contend that the merchandise is not now an oil of any kind, and also that the record does not disclose that it ever was fish oil.

The majority opinion of the board held with the importers upon these contentions, expressly so as to the latter clause and impliedly so as to the former one. In these particulars we are constrained to disagree with the decision, and in doing so we have not overlooked the legal rules which favor the findings of the board upon questions of fact when before us for review.

It is conceded, of course, that the merchandise was produced by the hydrogenation of some kind of an oil; the question therefore first arises as to the kind of oil which this originally was. In deciding this we must first observe that the invoices described the article as hardened fish oil, and furthermore that the importers entered it for duty under a similar description. In the absence of explanation these facts are certainly entitled to substantial weight in the decision of the present question. It is true that the invoice descriptions of merchandise are generally, perhaps always, open to explanation and contradiction, both by the Government and the importers; never-

theless, a statement against interest made by importers in their invoices and entries certainly establishes a prima facie case against any contradictory claim made by them in their protest. It is true, on the other hand, that the appraiser reported the oil to be "unidentifiable," but this report does not militate against the statement just above made, although it is entitled to weight as part of the evidence in the case.

As against this prima facie case we have the testimony of the importers' witness, Dr. Bacon, an expert in chemistry, who tested and analyzed a sample of the merchandise. His testimony as reported by the record is somewhat confusing, but as we understand it the final force and effect of it is that neither he nor any other expert would be able to ascertain by means of testing or analyzing the present merchandise whether the basic oil was fish oil as distinguished from other animal oil, nor to ascertain with certainty whether it was animal oil as distinguished from vegetable oil. In support of this interpretation of his testimony we copy the following extracts from it:

Q. What knowledge have you of fish oils?—A. I am thoroughly familiar with fish oil, the manufacture of it, the analyses.

Q. You have used fish oil in your business when you were in the manufacturing business?—A. I have used fish oil and the compounds with it; thoroughly familiar with it.

Q. Has this commodity any of the physical or mechanical characteristics of fish oil?—A. It has not. It differs entirely from fish oil.

*　　　*　　　*　　　*　　　*　　　*　　　*

Q. But as to vegetable, animal, and fish oils you express the belief that the process is a practical one as to those goods?—A. It would be possible, in my opinion, to hydrogenate those goods.

Q. Did you attempt by your analyses or other tests of any kind to ascertain the origin of this oil?—A. I did not attempt to ascertain the origin, because——

Q. That is sufficient; you did not attempt to ascertain it. That is a fact?—A. No; I did not.

*　　　*　　　*　　　*　　　*　　　*　　　*

Q. Would not fish oil that has been hydrogenated respond to the iodine test?—A. I doubt very much whether it would, as I just explained to you that the iodine measures across the unsaturation, which indicates that something may be added to the oil. If hydrogen were added to an oil of any kind, there would be a big reduction in iodine value and in all probability the hexic-promide tests would not work out, and the tests for linseed oil would be somewhat similar to that of fish oil. I personally, although I have had about 15 years' experience, would have to decline to say that I could judge or detect the origin, and I defy any other man to do it, of a fat, oil, or grease that had been hydrogenated.

Q. That is regardless of whether it is animal, vegetable, or fish?—A. You may be able partially to get something as to whether it was animal or vegetable origin, but whether it came from the marine animal or the land animal that, in my opinion, would be impossible. You may be able to say it is an animal product or vegetable product.

On the other hand we have the testimony of two Government chemists, Drs. Lane and Pickrell, both of whom made tests and

analyses of the merchandise, and both of whom testify that their examinations furnish ground for the belief that the original oil was fish oil. The following extracts are taken from their testimony:

Dr. LANE.

Q. So that what was the significance to you of the presence of cholesterol in this product?—A. That the fat was of animal origin.

\*      \*      \*      \*      \*      \*      \*

Q. The merchandise in these cases is invoiced as hardened oil (fish). Is there anything in your report which indicates that this is other than fish oil?—A. No, sir.

Q. Is there anything in your report to indicate that it is hardened fish oil?—A. The low gravity and the presence of cholesterol would indicate fish oil.

Dr. PICKRELL.

Q. Assuming, as reported in this case, that the samples contain cholesterol, would that fact convey any peculiar significance to you?—A. Yes, sir.

Q. What does it indicate?—A. It precludes the possibility of its being a vegetable oil.

Q. By the process of elimination what would it indicate?—A. Indicate to me that it was a fish oil.

Q. Dr. Lane testifies that the low specific gravity was indicative of its being fish oil; does that fact bear a similar indication to you?—A. To a certain extent.

Q. Is there anything other than low specific gravity and the presence of cholesterol that indicates that the oil is of fish origin?—A. Also due to the fact that I do not know of any animal oils other than fish oils and whale oils that have been hydrogenated.

Q. How long have you been familiar with hydrogenated oils?—A. For the past six or seven years.

Q. The merchandise is invoiced in each case as hardened fish oil. Does the report of analysis tend to confirm the correctness of that description?—A. It does.

\*      \*      \*      \*      \*      \*      \*

By General Appraiser McCLELLAND. If Exhibit A was submitted to you for your examination and opinion as to what the details of the analysis indicated, would you be able to say in answer to a question whether the details of the analysis indicated that before the process of hydrogenation the substance was fish oil?—A. I would say it was a fish oil.

\*      \*      \*      \*      \*      \*      \*

Dr. LANE. As far as I can go I can say yes. Mr. McClelland, I would say one thing. Very often in these analyses, take this or any one, we have to work by a process of elimination. Now, the gravity of that is so low it could not be tallow; it could not be lard or anything of that kind. Now, that eliminates those things. It is not a vegetable oil because it contains cholesterol instead of phytosteral. The unsaponifiable matter is high for either vegetable or animal. Then the question of hardening comes in. Hardening has a tendency usually to raise the gravity, but under certain conditions it could lower the gravity. For instance, if it alters the unsaturated acid to palmitic acid instead of stearic, it would lower the gravity. Now, there are many acids in fish oils which are comparatively unknown. Now, we did not know it would raise the gravity of those oils. Consequently by this process of elimination it looks as though this could be nothing but fish oil, and in our opinion it is a fish oil.

General Appraiser McCLELLAND. Then, really by a process of elimination, considering all the elements, you arrive at the conclusion that this is fish oil?

Dr. LANE. Yes.

This is substantially the extent of the testimony concerning the kind of oil with which the present merchandise originated, and we

are constrained to say that its clear and decisive preponderance sustains the description of the merchandise given by the importers themselves in the invoices and entries, and justifies the conclusion that the original oil was fish oil.

The next question which arises is whether the article in its condition at importation can be called an oil at all, hardened as it is to a consistency resembling tallow. It is contended by the importers that it is not an oil, since one of the qualities of oil is fluidity at ordinary room temperature.

In answer to this contention we may say that while it is true as a general rule that oils are fluid at ordinary room temperature, yet the rule is not universal nor exclusive. For example it appears from the testimony of Dr. Bacon that cocoanut oil solidifies at about 70° F., and palm oil at about the same temperature. They are nevertheless generally recognized as oils. It is said in the Encyclopædia Britannica, under the title of "Oils," that the name commonly embraces among other substances "the soft fats which may be fluid in their country of origin (e. g., coco-nut oil, palm)." Doubtless other oils which are fluid in the country of their origin become tallow-like when transported to cold climates without forfeiting their name as oils. We believe moreover that certain mineral lubricants, which are like soft grease in point of consistency, are commonly described in trade as nonfluid oils. We think therefore that the names "hardened oil" and "hydrogenated oil" were not misapplied in relation to the present article, for the oil was not in fact manufactured into a new or different article by means of hydrogenation, but remained oil in trade cognizance and for tariff purposes.

We feel confirmed in this conclusion by a comparison of paragraphs 44 and 498, supra. The first of these paragraphs imposes a duty of 3 cents per gallon upon "sod, seal, herring, and other fish oil, not specifically provided for" in the act. The other paragraph grants free entry to oils commonly used in soap making, but specifically excepts fish oils from the benefit of this provision. In so far, therefore, as paragraph 498 is concerned, which is the paragraph under which free entry is herein claimed, Congress has expressly declared that fish oil shall not be relieved of duty by reason of the fact that it is an oil commonly used in soap making. This being the case can it be believed that such oil may secure free entry under the paragraph simply by being brought to the consistency of grease or fat? We think not. The specific provision whereby Congress excluded such oils from free entry under the paragraph can not be avoided by that means, for it is not reasonable to believe that Congress intended to deny free entry to fish oil as such, and at the same time extend that privilege to the same oil if slightly processed before importation. The article would still be fish oil within contemplation of both para-

graphs. Assuming therefore, in accordance with our prior finding, that the imported article was fish oil in its first estate, we hold that it is dutiable as fish oil in its imported condition also.

These views bring us to the conclusion that the merchandise should have been classified and assessed by the collector at 3 cents per gallon as fish oil, under paragraph 44 of the act. A claim to this effect was made in protest 851286/2003, and therefore while the decision of the board sustaining the claim for free entry is reversed, the claim of the protest for an assessment of the merchandise at the rate of 3 cents per gallon as fish oil is sustained, and the case is remanded for reliquidation accordingly.

In protest 851874/4119 such a claim was not made and therefore the decision of the board sustaining the protest claim for free entry is reversed, and the protest is overruled without, however, affirming the correctness of the collector's assessment.

*Reversed.*