BUSH & CO. (INC.) *v.* UNITED STATES (No. 2127).[1]

1. HYDROGENATED OR HARDENED OIL.
   An oil which has been hardened by adding to its hydrogen content is not a chemical compound, but remains the oil it originally was.—United States *v.* Rockhill & Vietor et al. (10 Ct. Cust. Appls. 113; T. D. 38374).

2. CONSTRUCTION, PARAGRAPHS 5 AND 498, TARIFF ACT OF 1913—"CHEMICAL * * * COMPOUNDS"—"CHEMICALLY COMPOUNDED."
   Soya-bean oil which has been hardened by adding to its hydrogen content by means of a chemical reaction which produces an oil having properties not possessed by the original oil and available for uses for which the original oil was unsuitable, does not become a chemical compound under paragraph 5, tariff act of 1913, but is a chemically compounded oil within the meaning of that expression in paragraph 498.

3. EVIDENCE—PRESUMPTION IN FAVOR OF COLLECTOR—HARDENED SOYA-BEAN OIL.
   Hardened soya-bean oil was classified by the collector as a chemical compound under paragraph 5, tariff act of 1913, and claimed by the protest to be free of duty as an oil not chemically compounded such as commonly used in soap making. The Board of United States General Appraisers found the oil entitled to entry free

[1] T. D. 39076.

of duty as soya-bean oil under paragraph 561, but, in the absence of such claim in the protest, affirmed, without approving, the collector's decision, and the decision of the board is affirmed.

## United States Court of Customs Appeals, February 8, 1922.

APPEAL from Board of United States General Appraisers, T. D. 38766 (G. A. 8448). [Affirmed].

*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellant.

*William W. Hoppin*, Assistant Attorney General (*Frank P. Wilson*, special attorney, of counsel), for the United States.

[Oral argument October 27, 1921, by Mr. Washburn and Mr. Hoppin.]

Before DE VRIES, Presiding Judge, and SMITH, BARBER, and MARTIN, Associate Judges.

SMITH, Judge, delivered the opinion of the court:

Hardened soya-bean oil entered at Seattle was classified by the collector of customs as a chemical compound and assessed for duty at 15 per cent ad valorem under paragraph 5 of the tariff act of 1913, which paragraph reads as follows:

5. Alkalies, alkaloids, and all chemical and medicinal compounds, preparations, mixtures and salts, and combinations thereof not specially provided for in this section, 15 per centum ad valorem.

The importer protested that the importation was not a chemical compound, but that it was an oil commonly used in soap making and "not chemically compounded." The protestant therefore claimed that the merchandise was free of duty under paragraph 498, which reads as follows:

FREE LIST.

498. Grease, fats, vegetable tallow, and oils (excepting fish oils), not chemically compounded, such as are commonly used in soap making or in wire drawing, for stuffing or dressing leather, not specially provided for in this section.

The Board of General Appraisers found that the merchandise was not a chemical compound and that it was not chemically compounded. It was further held that the importation was more specifically provided for by paragraph 561 of the free list as soya-bean oil than by paragraph 498 as an oil not chemically compounded commonly used in soap making, and that therefore the oil was free of duty under the former and not under the latter paragraph.

On the ground that the importer had failed to claim free entry under paragraph 561, which provided for soya-bean oil by name, the board overruled the protests without approving the action of the collector, and the importer appealed.

The evidence in the case established without contradiction that the oil in controversy was soya-bean oil chemically modified while heated and under pressure by the addition of two or more atoms of hydrogen induced by the presence of nickel. By the catalytic action of the nickel a part of the oleic acid component of the oil gained for each of its atoms two atoms of hydrogen and was converted into stearic acid.

The chemical change thus accomplished added to the oil a quantity of stearic acid not found in the original oil and thereby caused the oil to harden or become solid at a temperature lower than would otherwise have been the case, but it did not convert the oil into a substance which was not an oil or fat. From that it follows that the hydrogenation of the oil did not result in a chemical compound and the finding of the board to that effect must therefore be sustained.—United States v. Rockhill & Vietor et al. (10 Ct. Cust. Appls. 113, 115, 116; T. D. 38374). Whether the chemical treatment to which the soya-bean oil was subjected produced a "chemically compounded oil" is another question and one which must be determined by the evidence and the meaning of the expression "chemically compounded."

I. F. Laucks, a witness for the importer, defined a chemically compounded oil or fat as "an oil into which either a chemical element or a chemical compound was introduced that was not found in oils in nature, by the introduction of which it changes the properties of which oil so that it has different properties from the natural oils." When asked to give an illustration of what he regarded as a compounded oil, he said, "I would [so] regard a boiled oil to which manganese or lead or ether compounds had been added and combined with oil. Such an oil does not occur in nature. There are no oils that contain lead. *It changes the properties of that oil. It makes it a very quick drying oil.* I would [so] regard a sulphurated oil to which sulphuric acid has been added and with which it has been combined. You might regard soap as a chemically compounded oil. An alkali has been added to an oil, and the character of the oil has been changed." (Italics are ours.) He admitted that the hydrogenation of the oil caused a chemical reaction and chemically produced a different product.

Harrold Failes, another witness for the importer, defined a chemically compounded oil "as one to which some chemical had been added that did not occur in the natural oil, fat, or grease, which increases the complexity of the oil, fat, or grease to which it is added." He stated that the oils treated with sulphuric acid, sulphur, bromine, and iodine were examples of chemically compounded oils. *He admitted that sulphur was a natural element of mineral oils, that iodine was natural to cod-liver oil, and that sulphur entered into vulcanized oils "in a manner analogous to the introduction of hydrogen."*

The definition of chemically compounded oils given by these witnesses is warranted by no authority which we can find and none was cited in the briefs or by either of the witnesses. Carefully analyzed, that definition simply means that a new product, produced from an oil by the chemical action of a reagent not natural to the original oil, which new product is thereby endowed with proper-

ties and uses not characteristic of the original oil, is a chemically compounded oil, whereas the introduction of a chemical agent *natural* to the oil and producing identically the same chemical effects is not a chemically compounded oil. We are quite convinced that Congress, far from contemplating any such distinction as that, was more concerned with the chemical effect produced on the original oil than it was with the reagent employed.

In our opinion it was not the legislative intent to discriminate against oils chemically changed by sulphuric acid, lead, or other foreign agencies into new products with new properties and limited or new uses, and to favor oils produced by adding hydrogen with a consequent chemical reaction attaining the same end as that achieved by the foreign agencies. To hold otherwise would result not only in an arbitrary concession to hydrogenated oils, but in classifying as dutiable oils containing sulphur or iodine and chemically treated with sulphur or iodine and in admitting to free entry oils not containing those elements, although chemically changed by them as reagents—an outcome justified by none of the ordinary rules of tariff making of which we are aware.

We find, first, that the introduction of additional hydrogen into the soya-bean oil in question produced a chemical reaction, which converted part of the oleic acid into stearic acid, and added to the material so chemically treated a larger quantity of stearic acid than that which it originally contained; second, that the stearic acid so developed by hydrogenating the soya-bean oil caused the oil to harden or become solid and thereby fitted it for the manufacture of hard soap, a use, according to the testimony, for which it would not have been available in its liquid form; third, that oils so chemically treated as to result in a chemical reaction which produces an oil having properties not possessed by the original oil, and available for uses for which the original oil was unsuitable, are "chemically compounded oils" within the meaning of that term as used in paragraph 498 of the tariff act; fourth, that an oil which is not so chemically treated as to convert it into a substance which is not an oil or fat is not a chemical compound; and fifth, that the importation is a chemically compounded oil.

The decision of the board overruling the protest without approving the action of the collector is therefore *affirmed.*