16

UNITED STATES *v.* W. H. & L. D. BETZ (No. 4368)[1]

United States Court of Customs and Patent Appeals, May 4, 1942

*Paul P. Rao,* Assistant Attorney General (*Joseph E. Weil* and *Joseph F. Donohue,* Special attorneys, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Allerton De C. Tompkins* of counsel), for appellee.

[Oral argument December 4, 1941, by Mr. Donohue and Mr. J. Stuart Tompkins]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, holding certain merchandise, entered at the ports of Baltimore, Md., and Philadelphia, Pa., dutiable as seaweed, manufactured, at 10 per centum ad valorem under paragraph 1540 of the Tariff Act of 1930 as claimed by the importer (appellee), rather than as a chemical compound at 25 per centum ad valorem under paragraph 5 of that act as assessed by the collectors at the ports of importation.

_____
[1] C. A. D. 208.

The merchandise in question, invoiced as seaweed, partly prepared, is known as "Norgine F," and, as imported, is a dry, coarse, flaky material.

The paragraphs in question read:

PAR. 1540. Moss and sea grass, eelgrass, and seaweeds, if manufactured or dyed, 10 per centum ad valorem.

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

The record in the instant case consists of the record in the case of *W. H. & L. D. Betz* v. *United States* (suit No. 4154), decided by this court March 6, 1939—26 C. C. P. A. (Customs) 399, C. A. D. 46— together with additional testimony of the witnesses L. Drew Betz, a member of the importing firm, and Lewis B. McSorley, chief chemist of the United States Customs Laboratory at Philadelphia (both of whom testified in suit No. 4154), and the testimony of appellee's witnesses Edwin M. Ross, a chemical engineer in the employ of appellee, and Selman A. Waksman, a professor at Rutgers University, who holds a degree of Master of Science from that university and a Doctor of Philosophy degree from the University of California, which degrees are in the field of biochemistry and microbiology.

It appears from the deposition of Hans Hamm, in suit No. 4154, a foreman in the employ of the Chemische Fabrik Norgine of Prague, Czechoslovakia (the exporting firm of the involved merchandise), that, at the time of the taking of his testimony, he had the "technical supervision and organization" of the exporting company; that Norgine F is prepared in the following manner: "The seaweed is washed in water and then cut out in pieces 10 cm. long. These pieces are again washed abundantly in water in which sulphuric acid and muriatic acid 2% of each are added. Thereafter the merchandise is again washed in pure water and the acid coating neutralized by means of soda. The seaweed is then dried and again cut into smaller pieces by means of notched rollers." It is stated in the deposition that "Inasmuch as nothing is taken away from the plant, the partly prepared seaweed possesses all the ingredients contained in the original article," and that "Everything in the basic material [the original seaweed], like the sample which I am attaching, remains in the finished product, excepting the seasalts and soils contained in the plants which were lost through the above described procedure."

In the deposition of Dr. Victor Stein, in suit No. 4154, a chemist and "co-partner of the Chemische Fabrik Norgine," it is stated that, in producing merchandise like that here involved, "The sea-weed is treated with acids and then with alkali so that the original indissolvable in water sea-weed became dissolvable. Inasmuch as from the plant nothing is taken away, the prepared sea-weed possessed all the

ingredients contained in the original article," and that, by the process to which the seaweed is subjected by his company, "the indissolvable calcium salt of the laminaric acid contained in the original plant has been changed into dissolvable sodium salt of the laminaric acid."

It clearly appears from the record that the original seaweed contains calcium alginate, the calcium acting as a base for alginic acid; that only a small percentage of calcium alginate is soluble in water; and that, in order to obtain the alginic acid (the substance desired by the importer, as hereinafter explained), it is necessary that the calcium base be removed.

It appears from the testimony of the witnesses Ross and Waksman, introduced in the instant case, that by washing seaweed with water containing 2 per centum sulphuric acid and 2 per centum muriatic acid bacteria are destroyed, salts, seashells and other impurities are removed, and the calcium which serves as a base for alginic acid is removed leaving the alginic acid in a free state; that, in order to obtain the alginic acid, it is necessary to remove the calcium base; that after removing the calcium base it is necessary to substitute therefor another base, such as sodium, in order to preserve the alginic acid; that unless such a base is substituted, a considerable portion of the alginic acid will be dissipated during the transportation of Norgine F; that, although, when a sodium base is substituted for the calcium base, a new chemical compound is created, to wit, sodium alginate, nevertheless, the alginate radical remains unchanged; that, except that a sodium base has been substituted for the calcium base for the alginic acid, that some of the cells are broken, and that it does not contain bacteria, salts, seashells, and other impurities, which have been eliminated by the washing process, the involved Norgine F retains all of the essential ingredients of the natural seaweed, the alginic acid and the cellulosic fibers being present in substantially the same quantity as in the original seaweed. Each of those witnesses testified that Norgine F is not a chemical compound, but is seaweed, prepared or preserved.

We quote from the testimony of the witness Ross:

X Q. Wouldn't you say that after the alginate radical has been treated and washed that you get a different commodity when the composition is changed?— A. No. There is just a different base in the material. May I illustrate it this way? Do you know what "zeolite" is?

X Q. No. I am sorry; I do not.—A. "Zeolite" is a material which has the property of exchanging calcium for sodium without changing the material itself. And this is entirely similar to that. We replace the calcium alginate through a process or a treatment with a new base, sodium, without affecting the original alginate radical at all. The seaweed is preserved by the treatment, but the product is the same.

The witness Ross testified that the samples of the involved merchandise analyzed by him contained 32.61 per centum alginic acid. The witness Waksman testified that the samples of the involved mer-

chandise analyzed by him contained 33 per centum alginic acid, which, he stated, was the equivalent of 37 per centum sodium alginate.

It appears from the testimony of the witness McSorley, a Government chemist, that he analyzed a sample of the merchandise involved in suit No. 4154 and found that it contained from 42 to 44 per centum sodium alginate.

The witness Isadore Schnopper, a chemist at the "Appraiser's Stores in New York," testifying on behalf of the Government in suit No. 4154, stated that he analyzed samples of the Norgine F there involved and found that, after removing the sodium base, it contained 40 per centum free alginic acid which, he stated, was the equivalent of 45.6 per centum sodium alginate.

The Government's witness Phillip T. Kirwan, a chemist attached to the United States Customs Bureau, testified, in suit No. 4154, that he examined a sample of the Norgine F there involved and found that it contained approximately 50 to 55 per centum sodium alginate. He stated that he would classify Norgine F as an "impure technical compound." When asked whether Norgine F was a mechanical mixture, he replied: "Inasmuch as it is an impure chemical compound, it is a mechanical mixture of a pure compound with the impurities that go to make it an impure compound."

It further appears from the testimony of the witness L. Drew Betz, submitted in the incorporated record, that, after importation, Norgine F is subjected to both mechanical and chemical processes in order to obtain the alginic acid contained therein; that after the alginic acid has been obtained it is treated with sodium carbonate in order to convert it into sodium alginate; that the sodium alginate thus obtained is used as a basic raw material in the manufacture of a water purifier; and that, in addition to the extraction therefrom of alginic acid, Norgine F is also used as a basis for the extraction of pharmaceuticals. The witness described the process to which Norgine F is subjected in order to extract the sodium alginate as follows:

The Norgine F is placed in a beater, diluted with water, and soda ash is added. It is subjected to mechanical action, which breaks down the particles to a very fine pulp. This is then added to a larger tank where it is diluted further with water, and the insoluble substances, consisting of cellulose, permitted to settle out. Filtration can be resorted to in the place of this settling process, if desirable. The clear liquor, after settling, is then siphoned off into another tank to which dilute sulphuric acid is added, which precipitates alginic acid, which rises to the top. The lower portion of the tank is then run off, and the alginic acid is pumped through a filter press to give us our cake alginic acid. This is then placed in another mixer and agitated with a sufficient amount of sodium carbonate to convert it into its sodium salt or sodium alginate.

Although there was some evidence in the incorporated record that the Norgine F involved in that case was prepared and preserved seaweed, this court, in affirming the judgment of the trial court, held,

on the record there presented, that the merchandise in question contained approximately 50 per centum sodium alginate; that the alginic-acid content had been converted into a chemical compound (although an impure one), to wit, sodium alginate; and that the imported merchandise was dutiable as a chemical compound under paragraph 5, *supra*. In so holding, the court said:

\* \* \* The fact that the imported merchandise contains substantially 50 per centum of impurities does not require that these impurities be charged with a duty since the rate in the paragraph is an ad valorem one and not a specific one.

In the instant case, the trial court, in an opinion by Tilson, Judge, analyzed the evidence, reviewed the authorities which it considered applicable to the issues presented, and held that the involved Norgine F contained only 37 per centum sodium alginate, the remaining 63 per centum consisting of the elements contained in the original seaweed; that it was seaweed, manufactured, and not a manufacture of seaweed; and that, although the original seaweed, as well as the involved Norgine F, was undoubtedly a mixture of chemical salts or chemical compounds and was, therefore, covered by the provisions contained in paragraph 5, *supra*, the involved Norgine F was more specifically provided for in paragraph 1540, *supra*, as seaweed, manufactured. In its decision, the court cited and quoted from the decisions of this court in the cases of *United States* v. *Holland-American Trading Co.*, 4 Ct. Cust. Appls. 336, T. D. 33527, and *United States* v. *Kraemer & Co. et al.*, 4 Ct. Cust. Appls. 433, T. D. 33858, and stated that an excerpt quoted from the latter case was particularly applicable to the issues in the instant case.

In the *Holland-American Trading Co.* case, *supra*, it was held that a metal polish, composed of 40.25 per centum silica, 5.25 per centum alumina and iron oxide, 1.71 per centum lime, and the remainder oleic acid, volatile petroleum, unsaponifiable oil (petroleum), saponifiable fat, and moisture, was not dutiable as a chemical compound or mixture under paragraph 3 of the Tariff Act of 1909, as claimed by counsel for the Government, but was dutiable at 20 per centum ad valorem as a manufactured article under paragraph 480 of that act. In so holding, the court said, *inter alia:*

Chemically speaking, some of the component materials may be chemical compounds or the result of chemical mixture, but we are unwilling to say on the record here that a substance composed so largely of silica, commonly known to be crushed quartz—the sand of the seashore—alumina, one of the most abundant of earths (see Century Dictionary), and petroleum and saponifiable fat is a chemical compound or mixture under paragraph 3.

In the *Kraemer & Co.* case, *supra*, the court, in holding that a powder, containing 85.69 per centum calcium phosphate and 9.20 per centum calcium carbonate (those materials being minerals rather

than chemicals), used for polishing plate and other metal surfaces, was not dutiable as a chemical mixture under paragraph 3 of the 1909 Tariff Act, stated, *inter alia:*

We pause for a moment to note that the phrase "chemical mixture," under the rules of construction laid down by this court and for many years sanctioned by the Supreme Court, does not mean a mixture made up in a minor part of chemicals, but must be taken to mean a mixture made up *substantially entirely of chemicals.* United States *v.* Burne (4 Ct. Cust. Appls., 298; T. D. 33515); Kenyon Co. *v.* United States (4 Ct. Cust. Appls., 344; T. D. 33529).

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Constituting, as these [the calcium phosphate and the calcium carbonate] do, 94.89 per cent of the powder as mineral, *it can not be said that it is wholly or in chief value of a chemical, which is necessary in order to come within the scope of that term as a chemical mixture in paragraph 3.* [Italics not quoted.]

The court then cited and quoted from the decision in the *Holland-American Trading Co.* case, *supra.*

See the following cases for definitions of chemical compounds and chemical mixtures: *McKesson* v. *United States,* 1 Ct. Cust. Appls. 213, T. D. 31256; *Strohmeyer & Arpe Co.* v. *United States,* 2 Ct. Cust. Appls. 285, T. D. 32035; *United States* v. *Davies, Turner & Co. et al.,* 5 Ct. Cust. Appls. 196, T. D. 34325; *Aetna Explosives Co.* v. *United States,* 9 Ct. Cust. Appls. 298, T. D. 38238; and *United States* v. *Rockhill & Vietor et al.,* 10 Ct. Cust. Appls. 112, T. D. 38374.

In the instant case, counsel for the Government, evidently relying upon the evidence in the incorporated record, called but one witness, Dr. McSorley, who had not analyzed the involved Norgine F and was unable, therefore, to testify with regard thereto.

We have reviewed the testimony in the incorporated record, together with the testimony of the witnesses Waksman and Ross, and are unable to hold that the trial court's findings of fact, that is, that the involved Norgine F consists of 37 per centum sodium alginate and approximately 63 per centum of the elements contained in the original seaweed, are contrary to the weight of the evidence. Furthermore, it clearly appears from the testimony introduced in the instant case that the sodium was added to the seaweed to serve as a base and preservative for the alginic acid contained therein, and that had not the sodium or some other suitable base been added, a considerable portion of the free alginic acid would have been dissipated during transportation of the involved Norgine F to the United States. It may be said at this point that no such testimony was before us in the case of *W. H. & L. D. Betz* v. *United States, supra.*

As hereinbefore noted, the acid used in washing the seaweed removes the calcium base from the alginic acid, leaving the alginic acid in a free state in the seaweed. It clearly appears from the record that had the seaweed been imported with the alginic acid in a free state it

would have been necessary to subject the imported article to further processing in order to obtain the alginic acid, just as it is necessary to subject Norgine F to further processing in order to obtain alginic acid. Furthermore, it is apparent from the record that whether appellee's process or some other process is used, it is necessary to dissolve the involved Norgine F in order to obtain alginic acid. It is also apparent that whether Norgine F is dissolved in water or in water containing acid, the alginic acid is liberated from its sodium base and the sodium alginate destroyed. It is evident, therefore, that *the sodium alginate contained in Norgine F cannot, as such, be obtained from the Norgine F, and that, in order to obtain sodium alginate, it is necessary to treat the alginic acid obtained from Norgine F, not the Norgine F, with sodium.*

Paragraph 5, *supra,* provides for chemical compounds "*obtained* naturally or artificially and not specially provided for." [Italics ours.]

Owing to the fact that the sodium carbonate serves as a temporary base and preservative for the alginic acid contained in Norgine F, and as the alginic acid is freed from its sodium base and the sodium alginate is destroyed *in the processing to which Norgine F must be subjected in order to obtain alginic acid,* it is evident that the involved Norgine F is not sodium alginate. Furthermore, we are of opinion that Norgine.F, although *containing* alginic acid, is not alginic acid (a chemical compound) within the purview of paragraph 5, *supra.*

In providing for chemical compounds, the Congress must have had in mind chemical compounds commercially salable as such, and it would seem to be clear from the record presented that Norgine F would not be a good delivery on an order for alginic acid.

From what has been said, it is apparent that the involved Norgine F is not crude or unmanufactured seaweed.

The next question presented is whether the involved Norgine F is seaweed, manufactured, or a manufacture of seaweed. The only evidence of record that merchandise like that' here involved may be used for purposes other than the extraction therefrom of alginic acid is the testimony of the witness L. Drew Betz, who testified as follows:

Q. Now, are there any other uses for the imported material which you are familiar with besides the one which you are making of it?—A. Why, the imported merchandise may serve as a raw material for some other industries, perhaps pharmaceuticals. I happen to know, from being present in Czechoslovakia, that pharmaceuticals are extracted from it by this very concern that makes shipment to us.

Q. Any other uses?—A. It possibly has other uses as,' perhaps, cattle food or——

* * * * * * *

The WITNESS. I am afraid I can't give typical examples of it, but it has these possible uses. I do know it serves as a basis for the extraction of pharmaceuticals.

* * * * * * *

A. There are probably other uses to which it can be put. I can't testify that I know every possible use for this material. I know that there is very little, if any, other brought into this country. I know of no other use to which it is put in this country.

It will be observed that the witness stated that he knew of no use in the United States for merchandise like that here involved other than the extraction therefrom of alginic acid, and although he testified that pharmaceuticals had been extracted from like merchandise in Czechoslovakia, he did not state to what extent, and it is apparent from his testimony that he had but little information regarding any such use. The witness was unable to name, or at least he did not do so, any of the pharmaceuticals, which, he said were extracted from such material in Czechoslovakia. Whether alginic acid is included within the term "pharmaceutical" does not appear from the testimony of the witness, and we have been unable to determine from any scientific authority to which we have access that it is not so classified.

Although the record does not establish the uses of the seaweed from which the involved Norgine F was produced, it is a matter of common knowledge that seaweeds are used as fertilizer (see Summary of Tariff Information, 1921, page 1186), and that they also have various other uses (see Summary of Tariff Information, 1929, page 2454).

It clearly appears from the evidence of record that the involved Norgine F has been produced by both chemical and physical processes of manufacture; that it has attained a distinctive name and character, different from that possessed by the seaweeds from which it was produced; that, although it is a material from which alginic acid may be obtained, it is, nevertheless, a completed article of commerce, having but one use or class of uses; and that it is not commercially capable of the various uses to which seaweeds may be put.

We are of opinion, therefore, that the involved Norgine F is a manufacture of seaweeds, and is not seaweeds, manufactured. See *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963; *Kleinberger & Katz* v. *United States*, 12 Ct. Cust. Appls. 571, T. D. 40798; *A. H. Ringk & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769; *Fujii Shoten* v. *United States*, 17 C. C. P. A. (Customs) 79, T. D. 43362; *Konishi Kotakudo Co. (Inc.)* v. *United States*, 17 C. C. P. A. (Customs) 355, T. D. 43798; *United States* v. *Geo. S. Bush & Co.*, 29 C. C. P. A. (Customs) 241, C. A. D. 197. For a discussion regarding the distinction between a material manufactured and a manufacture of a material see *United States* v. *Wilkinson Process Rubber Sales Corp.* (cross-appeals), 22 C. C. P. A. (Customs) 60, T. D. 47051, and *United States* v. *General Dyestuff Corp.*, 29 C. C. P. A. (Customs) 53, C. A. D. 170.

Owing to the fact that there is no provision in the Tariff Act of 1930 for manufactures of seaweeds, we are of opinion that the involved Norgine F is dutiable as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1558 of that act, and that that claim in appellee's protests should have been sustained by the trial court.

For the reasons stated, the judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.