(C. D. 917)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 23, 1945)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector* and *Richard F. Weeks*, special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: The imported merchandise in question is invoiced as "Boron Carbide (Norbide) Cylinder Blanks." Duty was assessed

thereon at 30 per centum ad valorem under paragraph 214 of the Tariff Act of 1930, as earthy or mineral substances not specially provided for. The plaintiff claims that it is properly dutiable at 12½ per centum under paragraph 302 (l) of the Tariff Act of 1930, as modified by the Canadian Trade Agreement, T. D. 49752, or at the rate of 20 per centum ad valorem under paragraph 1558, as a nonenumerated manufactured article. The plaintiff alternatively claims that the assessment of a higher rate of duty than 12½ per centum is in violation of section 6 of the Customs Administrative Act of 1938.

At the trial the plaintiff established that boron carbide is a substance manufactured by combining "pitch coke and dehydrated boric acid glass" and subjecting it to high temperatures in a totally enclosed resistance type electric furnace. The substance is removed from the furnace in large lumps resembling coke in appearance and consisting of boron carbide having a chemical formula of $B_4C$. The next step is to crush and grind the material into a powder. In such process considerable iron from the machinery becomes mixed with the substance and is removed therefrom by treating it with acid and then washing out the acid with hot water. The powdered boron carbide in its pure state is sold for use as an abrasive and as a source of boron for metals and alloys.

The evidence further establishes that boron carbide in its powdered form is also changed to other forms by placing the powder in graphite containers or molds of various shapes and sizes and again subjecting the material to very high temperatures, at the same time applying pressure to the molds. Without the use of any added substance as a binder, the boron carbide is formed into various shapes according to the molds such as cylinder blanks, blocks, and other forms of various sizes. According to the uncontradicted testimony, these forms are rough blanks composed solely of boron carbide and in such condition have no particular use. However, these blanks are suitable for manufacture into many and various articles of commerce. They may also be crushed into a powder and used for abrasive purposes, although such use of the "blanks" is not commercially feasible.

The exhibits admitted in evidence are as follows: Illustrative exhibit A is a cylinder 1¼″ long and 3¼″ in diameter with a cylindrical hole through the center 5⁄16″ in diameter. This exhibit was admitted as illustrating the imported merchandise. Exhibit 2 is a can containing a mixture of rough lumps and powdered material. The powdered portion resembles metallic crystals and the lumps a fused metallic substance. Illustrative exhibit B consists of two cylinders, one 3″ long by ¾″ in diameter having a small hole about ¼″ deep in each end, and the other a cylinder 1¾″ long and ⅜″ in diameter also having a similar hole in each end. Exhibit 3 is a small pamphlet containing illustrations of boron carbide in lump and in molded shapes with

advertising suggesting that the powdered form competes successfully with diamond dust and that the molded shapes may be "cut and worked into infinite numbers of products which find extensive use wherever a hard wear resistant material is required." Exhibit 4 is a 6-page pamphlet advertising pressure nozzles for sandblast apparatus which are manufactured by the importer from blanks such as illustrative exhibit B. Exhibit 5 is a letter to the appraiser at Niagara Falls from the shipper herein stating that cylinder blanks may be ground and polished to form plug gauges and that the cylinders are never used for abrasive purposes. Exhibit 6 is a pamphlet advertising Norbide abrasive. Exhibit 7 is a cylinder of boron carbide 1½" long by ¾" in diameter and having a hole through the center that is elliptical rather than cylindrical. Exhibit 8 is a 13-page pamphlet describing the manufacture and uses of Norbide the trade name for the boron carbide manufactured by the Norton Co., the exporters. The pamphlet describes the uses in the grain and flour forms and also in the molded form and contains illustrations of articles manufactured from the boron carbide blanks.

One of the witnesses testified that illustrative exhibit A could be cut into "bore stock for making inserts in different types of gauges"; that it could be made into a ring gauge which consists of annular rings; that it could be cut into thin slices and made into compression resistant washers for use as thrust bearings; that it could be polished on the interior and used as a high-speed spindle; and that it could be made into a plug gauge by inserting a handle at one end and a bolt and nut at the other. The witness further testified that boron carbide is extremely hard, in fact, the hardest known substance ever manufactured and therefore has great wear resistant properties; that it also has a peculiar electrical behavior making it of interest in electronic tube development and in the metallurgical arc as a rectifier; and that its negative temperature coefficient of resistance makes it a fine material for making igniter tubes. The witness further testified that the Canadian plant does not make articles of boron carbide which are fit for commercial uses; that boron carbide is formed into various molded shapes, a number of standard sizes having been established covering a wide range; that after importation these molds may be manufactured into various articles but the material is extremely hard and it has to be cut, worked, and ground to shape with a diamond wheel, the diamond being the only material that will scratch boron carbide.

The acting appraiser of merchandise at Niagara Falls testified for the Government that he had been acting appraiser since 1934; that he made inquiry at the Norton Co. plant at Chippawa, Canada, for the purpose of obtaining information concerning boron carbide blanks; that before March 1942, under a ruling from the Customs Information

Exchange, the merchandise in question was classified under paragraph 302 (l), as claimed by the plaintiff.

At the close of the trial counsel for the Government moved to dismiss the protest on the ground the plaintiff had failed to make out a prima facie case. The motion was taken under advisement by the court. The motion to dismiss is denied.

The question in this case is whether or not boron carbide, a manufactured material, is any the less boron carbide when it has been molded into various blank shapes and forms after reaching its powdered state; in other words, whether or not the molded forms, as imported here, consist of manufactures of boron carbide rather than the material, boron carbide, eo nomine provided for under paragraph 302 (l), as amended.

In support of its contention that boron carbide molded into the form of blanks was still classifiable under the eo nomine provision for boron carbide, counsel for the plaintiff cites Vanillaproco, Inc. v. United States, 6 Cust. Ct. 441, C. D. 510, where vanilla beans in powdered form were held properly classifiable as "vanilla beans" eo. nomine provided for; Nootka Packing Co. v. United States, 22 C. C. P. A. 464, T. D. 47464, where our appellate court held that minced clams were properly dutiable under the eo nomine provision for "clams"; Asai v. United States, Abstract 27172, holding ground apatite free of duty under the eo nomine provision for "apatite"; Balfour Guthrie v. United States, 5 Cust. Ct. 180, C. D. 397, where palm oil oleine, a palm oil from which the greater part of the stearine had been extracted, was held classifiable under the eo nomine provision for palm oil; Universal Lamp Co. v. United States, T. D. 43963, where a manufactured material known as ferrocerium, which, after manufacture, had been molded into the form of thin rods 2.8 millimeters in diameter, and cut into lengths approximately 5 millimeters long suitable for use as flints in cigar lighters, was held properly dutiable under the eo nomine provision for "ferrocerium" as urged by the Government rather than under the provision for "flints" and "flint stones," as contended for by the importer, the court stating that it was—

* * * not sound law to hold that the mere cutting of these lengths into small pieces operates to change the classification of this merchandise from ferrocerium to manufactures of ferrocerium.

In United States v. National Importing Co., 12 Ct. Cust. Appls. 186, T. D. 40169, also relied upon by the plaintiff, certain pieces of pressed amber, resembling pipe bits and cigarette holders, except that they were not bored or so shaped as to be usable for those purposes in the condition imported, although requiring very little change to make them conform exactly with the various kinds of pipe bits and cigarette holders in common use, were held not to be smokers' articles, but

rather properly classifiable as "Amber and amberoid, unmanufactured, not specially provided for." The evidence there disclosed that the articles were sold to manufacturers of smokers' articles and to jewelers for making pendants and drops. The importer's contention, as appearing in the court's decision, was that "while the amberoid pieces in shape have an exact resemblance to pipe bits or smokers' articles, they have not been manufactured to such an extent as to commit them or dedicate them to use as such, nor to render them commercially unfit for other uses, and that in view of the proof which establishes that their use is for making smokers' articles and jewelry, they must be classified as amberoid, unmanufactured." In sustaining such contention, our appellate court stated:

The authorities seem to be unanimous in their support of the proposition that in order to take the importation out of paragraph 11 as amberoid, unmanufactured, it must be found that they were manufactured to such extent that they were committed or dedicated to a use as smokers' articles alone, and that if they had not been so manufactured when imported, and were in such form that they could readify be used for other purposes and were so used, they should be classified as amberoid, unmanufactured.

The books are replete with decisions holding that *eo nomine* provisions in the tariff acts appearing without words of limitation intend to include the article in all its forms unless a contrary legislative intent otherwise appears. In *United States* v. *Rockhill*, 10 Ct. Cust. Appls. 112, T. D. 38374, an oil derived from fish, chemically treated so as to become a hardened material resembling tallow, was held to be erroneously classified as a chemical compound because the essential character and qualities of the oil survived the operation, and the oil was not in fact manufactured into a new or different article so as to be deprived of the name of the oil by the trade, and that the processing was not such as would exclude it from the fish-oil paragraph or include it in the paragraph covering soap oils which specially excluded fish oils. In *Bush* v. *United States*, 11 Ct. Cust. Appls. 246, T. D. 39076, a chemically hardened soybean oil, having added thereto a quantity of stearic acid not found in the original oil, enabling it to harden at temperatures lower than otherwise and to become fitted especially for the manufacture of hard soap, a use for which it would not otherwise have been available in its liquid form, was classifiable as soybean oil rather than as a chemical compound. In *Thermal Syndicate, Ltd.* v. *United States*, 7 Cust. Ct. 119, C. D. 550, the merchandise was fused silica. The collector assessed it for duty under paragraph 214 as an earthy or mineral substance. The importer claimed that it was free of duty under the *eo nomine* provision for silica in paragraph 1775. The Government admitted that the product was amorphous silica which had been fused by artificial means and that it differed from silica sand only by reason of it having been changed to an amorphous state from a crystalline condition and was in lump form rather

than in the form of sand. The evidence showed that it was imported for the purpose of manufacturing articles requiring a resistance to a high degree of heat. The court held that in providing for silica by name, without words of limitation or description, it must be presumed that Congress intended to include all silica not otherwise provided for, even though such silica had been manufactured into a rocklike substance such as the fused silica before it. See also *Thermal Syndicate, Ltd.* v. *United States*, 12 Cust. Ct. 205, C. D. 855, involving pieces of fused silica broken off in the process of manufacturing silica articles, found by the court to be "silica in fact" properly classifiable under the *eo nomine* provision for silica rather than as a waste, not specially provided for, under paragraph 1555.

The Government contends that the boron carbide in question in the form of cylindrical blanks is advanced beyond either the abrasive or the metallurgical compound stage and is a manufacture of boron carbide, and if the cylindrical blanks are to be regarded as anything less than manufactures of boron carbide and are merely unenumerated manufactured articles, as such, they are properly dutiable under the provision therefor rather than under the provision for "boron carbide." The Government has cited many cases in support of its contention. A careful examination thereof discloses that none of them are applicable to the controversy here before us. Except as noted below, none of the cases cited involved unqualified *eo nomine* provisions such as here before us. In *United States* v. *General Dyestuff Corp.*, 29 C. C. P. A. 53, C. A. D. 170, certain Montan wax was claimed to be classifiable under the provision for mineral wax. The wax imported, however, had been changed in character by bleaching and chemical action to a condition suitable for a highly specialized use for which it was not adaptable before such treatment and the court held it to be classifiable as a nonenumerated manufactured article rather than as a manufacture of wax or as "Wax: * * * mineral, not specially provided for." The preparation of the material for a highly specialized use by changing its composition clearly distinguishes that case from the case at bar. There, in order to change the form of the material, chemical action was necessary. In *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, certain seaweed boiled with a sauce and canned was assessed as vegetables, prepared in any way. The importer claimed free entry therefor as seaweeds, crude or unmanufactured, or as seaweeds, manufactured. The court held that the collector had properly classified the merchandise, stating that—

The tariff act distinguishes between a mere advancement and a manufacture. An importation can not be assumed to be a manufacture merely because shown to be advanced. [See syllabus.]

The *Ishimitsu* case, *supra*, cannot be used as an authority for holding boron carbide to be excluded from its *eo nomine* provision inasmuch as the appellate court did not have before it for consideration an unqualified provision therefor, or a commodity composed solely of seaweeds. In *Downing* v. *United States*, 2 Ct. Cust. Appls. 364, T. D. 32093, the merchandise was sheets of dried rag pulp intended to be used to make paper. The collector assessed it for duty as paper, not specially provided for. The Board of General Appraisers held it dutiable as manufactures of cotton or as manufactures of flax. The importer claimed it dutiable by similitude to wood pulp. Our appellate court held that the Board's classification was correct. Clearly to classify the merchandise under the *eo nomine* provision for paper would not have been proper in view of the fact that the final manufactured state of the imported commodity was to be paper, and therefore, at the time of importation, it must have been something less than paper.

Counsel for the Government stresses the point that Congress intended to cover only the raw material when it designated boron carbide *eo nomine*, and as authority refers to the remarks of Senators Barkley and Smoot. (Congressional Record, vol. 72, part 4, 71st Cong., 2d sess., p. 3717.) Senator Barkley was of the opinion that the *eo nomine* designation for boron carbide should be stricken from the bill because it was provided for as an artificial abrasive under paragraph 1570, if crude, and under paragraph 1415, if further advanced in manufacture, and that boron carbide was a raw material. Senator Smoot contradicted Senator Barkley, stating that they were talking about a manufactured product, to wit, boron carbide. From this meager discussion Government counsel deduces that the boron carbide contemplated is the material as it comes from the furnace. In our opinion, it would seem that inasmuch as the material remained in the tariff act under its *eo nomine* designation, rather than becoming expunged from the act as suggested by Senator Barkley, the *eo nomine* provision would contemplate a manufactured product or material that was something more than an artificial abrasive.

A consideration of the record before us, together with the exhibits in the case, is convincing that boron carbide in the form of blanks is directly classifiable under the *eo nomine* designation therefor as claimed, and such classification was within the contemplation of Congress when the provision was inserted in the Tariff Act of 1930 without limitation or qualification. In view of our conclusion, we find it unnecessary to discuss the claim that section 6 of the Customs Administrative Act of 1938 was violated by the collector in his assessment of duty.

For the reasons stated, and following the principles announced in the cases cited in support of classsification of merchandise under its

*eo nomine* designation, judgment will be entered in favor of the plaintiff directing the collector to reliquidate the entry and make refund accordingly.