## UNITED STATES *v.* ROBERTSON (No. 418).[1]

1. "ROUGH LEATHER" IN PARAGRAPH 451, TARIFF ACT OF 1909.

"Rough leather" as used in paragraph 451, tariff act of 1909, had such a well-established and definite trade meaning before and at the time of that enactment that no change or modification of the meaning by interpretation is permissible.

2. SAME.

Where the hides of the importation had been tanned by prolonged soaking in a running stream, chosen for the purpose because of a peculiar effect that particular water had upon the hides and where the hair of these hides had then been scraped off with knives, and the hides with oil upon them trodden down in barrels, replaced again in the running stream, later to be removed, tightly stretched and pegged on the ground to dry and bleach in the sun, and so made water tight: *Held* this leather, as shown by the evidence, being now ready for immediate use in manufacture, is not rough leather, but leather, rather, not specially provided for, tanned and curried in effect, and as such dutiable at 15 per cent ad valorem under paragraph 451, tariff act of 1909.

United States Court of Customs Appeals, March 27, 1911.

APPEAL from decisions of the Board of United States General Appraisers, G. A. 7042 (T. D. 30720) and Abstract 23746 (T. D. 30828).

[Reversed.]

*D. Frank Lloyd*, Assistant Attorney General (*Charles D. Lawrence* on the brief), for the United States.

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

In the months of November and December, 1909, the appellees, L. F. Robertson & Sons, imported from Japan a quantity of leather packed in cases.

---

[1] Reported in T. D. 31458 (20 Treas. Dec., 609).

It is conceded that the importation was dutiable, and that the rate of duty was governed by paragraph 451, tariff act of 1909. The following parts of that paragraph contain all the provisions relevant to this case:

B ind, bend, or belting leather, rough leather, and sole leather, five per centum ad valorem; dressed upper and all other leather, calfskins tanned or tanned and dressed, kangaroo, sheep and goat skins (including lamb and kid skins) dressed and finished, other skins and bookbinders' calfskins, all the foregoing not specially provided for in this section, fifteen per centum ad valorem.

The importers maintained that the importation was "rough leather," and therefore dutiable at 5 per cent ad valorem. The collector, however, held that the leather was not "rough leather," and that it was dutiable at 15 per cent ad valorem as leather "not specially provided for" in the section.

The importers filed their protest to this decision, and the same was duly heard upon evidence by the Board of General Appraisers. The board held with the importers, that the leather was "rough leather," and the decision of the collector was therefore reversed.

The Government thereupon filed its petition here, together with the record containing the evidence, and also the exhibits, and prays for a reversal of the decision of the board. The issue made by the parties is therefore to be determined by finding the meaning and the application with respect to this importation of the term "rough leather," as used in the paragraph above quoted.

Other questions were raised in the presentation of the case to the board; but it is now conceded that only this one question need be considered and answered, and that it is decisive of the issue.

The counsel for appellees states that so far as he can ascertain, by examination, this is a new provision in the tariff act of 1909, which has never appeared in any preceding tariff enactment. Both parties agree that the term "rough leather" has long been known and used as a trade designation in the leather trade in this country, and each party has called a number of expert witnesses to give its accepted definition. These witnesses are merchants and manufacturers in that line of business, and fortunately they substantially agree as to the correct definition of the term. In fact, there is so little appearance of difference among them that it may fairly be said that the parties have agreed upon the trade meaning of the expression.

Rough leather, as understood by the trade, was such leather as had been tanned and unhaired, and not given any further finishing treatment. It was thus contradistinguished from dressed or finished leather.

The first process, generally stated, in the treatment of hides is to tan them, which also includes unhairing them. Before the hides are tanned they are not called leather at all; when they are once tanned they become leather. When only tanned and unhaired they are rough leather. When such leather is afterwards finished and dressed by

other processes it ceases to be rough leather. This finishing process is generally called currying, and in brief and general terms it may be said that the hides leave the tanner and come to the currier as rough leather, and leave the currier as finished or dressed leather.

The following extract from Spon's Encyclopedia, under title of "Leather," gives a better statement of these distinctions:

Leather manufacture may be broadly divided into two stages; "tanning," in which the raw hide is converted into the imputrescable and more or less flexible material known as "leather," and "currying," in which the leather is further manipulated, and treated with fatty matters, to soften and render it more waterproof, and to improve its appearance. Glove kid and certain other leathers, however, are not tanned at all, but "tawed," or prepared with a mixture in which alum and salt are the most active ingredients; and many leathers can scarcely be said to be curried, although more or less oil is used in the final processes of "finishing" or "dressing."

*     *     *     *     *     *     *

In general terms, the process of currying consists of softening, leveling, and stretching the hides and skins which are required for the upper leathers of boots, and other purposes demanding flexibility and softness, and in saturating or "stuffing" them with fatty matters, not only in order to soften them, but to make them water-tight and to give them an attractive appearance.

The question then is, What point in the processes above described has been actually reached by the importation?

As has been stated, this leather comes from Japan. In that country there is a brook which takes its rise in a silver mine, the water of which seems to have some peculiar properties in its effect upon the hides of cattle. This has resulted in establishing an industry of curing and treating hides in that countryside, not by means of large factories, but rather by the hand labor of individual workmen.

The green hides, with the hair yet upon them, are first submerged in the water of the brook, and are allowed to remain there for two or three months, depending upon the season of the year. After such a period of immersion the hides are taken out of the brook and the hair is scraped or cut off by hand labor, by means of small knives. · The flesh side is also scraped or "scratched" by hand, by means of a small tool. The hides are then packed in barrels, two or three to a barrel, together with some "simple oil," and a workman treads and stamps upon them, and kneads them in this manner. After this treatment they are again placed in the brook, this time for only a few days. They are then taken out and tightly stretched and pegged upon the ground, and allowed to remain thus a week or two, "according to the heat," to dry and bleach in the sun.

This is the process as described by the witnesses, and while much of the testimony upon the subject is hearsay, indeed almost necessarily so, yet it seems to be accepted as correct by both parties and no doubt is a substantially true statement of the process. It seems that the water of "the river which flows from the silver mine" has some peculiar chemical properties, for an effort was made to use another

stream, probably near by, for this same purpose and it was unsuccessful. The leather produced by this treatment is soft and flexible; it is white in color; it is imported in entire hides, with the edges untrimmed and the peg holes of the stretching process still in them. Several witnesses who have no personal knowledge of the treatment of the hides in Japan, and who testify as experts from an examination of the leather, say that it must have been also washed with alum. It is also stated as the opinion of some such witnesses that the leather has been split and rolled in order to bring it to its condition when imported, this being expert opinion based wholly upon an examination of the exhibit. These statements are not mentioned as proof of the processes followed in the treatment of the leather, but rather to serve in part as a description of the present appearance and character of the importation itself.

The leather thus produced and imported into this country is largely used here in the manufacture of tips for men's suspenders. One of the virtues for this use is the alleged fact that it does not tarnish the polished metal of the suspenders with which it comes in contact. For this use the leather as imported requires no additional treatment of any kind. The pieces are cut by means of dies from the imported leather, and are ready for use in the suspender.

The importer, Mr. Robertson, says that he sells his imports mostly, if not entirely, to suspender manufacturers, and he also says that one half of all such importations is so used, the other half being used for small wares and in the furniture trade. One Government witness estimates that 75 per cent of such imported leather is used for suspenders, and another says 90 per cent.

The definition of rough leather being given, and the history and description of the importation also, the question recurs whether the term covers and includes the article or not. The witnesses for the importers all testified specifically upon view of the official exhibit that it was in fact rough leather; the witnesses for the Government all testified specifically upon similar view that the exhibit was not rough leather. There were eight witnesses of apparent information, intelligence, and candor on each side.

As has been explained above, the process to which this leather was submitted is peculiar. In the treatment of the hides in Japan there was no tannery in the ordinary acceptation of the term as used in this country, nor were there distinctive curriers. And this is one cause of the confusion and difference between the parties in this case. For where the industries are separately carried on, the trade finds a natural and easy means of determining whether the leather is yet rough or not.

But when the entire process in Japan is summed up, and its effects are measured, and the character and qualities of the leather considered, it becomes manifest that the hides so treated have practically been both tanned and curried. That is, they have not only been "converted

into the imputrescable and more or less flexible material known as leather," but they have also been "softened, leveled, and stretched, and have been saturated or stuffed with 'fatty matters, not only in order to soften them, but also to make them water-tight, and to give them an attractive appearance." That is to say, they have in substance and fact been both tanned and curried; they have not only been converted from hides into leather, but the leather itself has been advanced from its first condition and has become so far finished and dressed as to be now ready for most of its final uses.

As has been stated, one-half or more of such importations goes directly into the making of suspenders. A leather which is so far finished as to be fit in that proportion for its use in manufacture can hardly longer be called rough leather. Some of the witnesses testify that the leather can be used for small wares and furniture without any additional treatment; others that it would require additional processes to fit it for these uses. Probably both statements are partly correct. Nevertheless it may fairly be said that only in exceptional cases does the leather require further finishing to prepare it for any of its final uses. Such a finding makes it impossible to apply the term "rough leather" to it with the definition given to the term by the trade witnesses whose testimony appears in the record. For after all it is the character of the leather itself which must finally determine what its proper classification is.

And even if the leather is not fully finished for every purpose, it is nevertheless so far finished in character as to be effectually taken out of the class of rough leather which, properly understood, is leather that is not finished at all. It is contended by the importers that domestic rough leather, such as illustrative Exhibit A, which plainly is undressed and unfinished leather, is also used in its rough state for some purposes. It is therefore argued that the mere fact that the importation may be used in its present condition ought not to take it out of that class. But the uses made of rough leather, like Exhibit A, are only a few rough uses, such as for valves and washers; and the proportion of such leather thus used is so small as to be almost beneath calculation.

It may furthermore be observed that leather has been prepared by domestic manufacturers to compete with this imported leather in the making of suspender tips. In such cases the effort was made to give the domestic leather the same qualities, except color, possessed by the imported article. Such domestic leather was regarded as dressed or finished.

It also appears that leather similar to the importation has at times been produced in this country. This explanation is given of the process:

The hide is soaked in water, then we put it in the lime to take the hair off, and after the lime was taken off we split the hide and take the grain side and process it in alum, flour and eggs, and a little oil, and it is stamped over in oil or barrels, as

described, until it is soft, and after the stamping is complete this hide is stretched over stretchers to make it soft and pliable and suitable for commercial purposes.

The domestic leather thus produced was recognized by the trade as finished leather.

One other matter should be briefly noticed before reaching a final conclusion. In paragraph 438 of the tariff act of 1897 all of the different kinds of leather named in the present paragraph are made dutiable at 20 per cent ad valorem. Rough leather, however, did not appear there under that name. In the present paragraph these different kinds are separated into two classes, the first being dutiable at 5 per cent ad valorem, the second at 15 per cent.

The following quotation will show the provisions of the act of 1897:

Band or belting leather, sole leather, dressed upper and all other leather, calfskins tanned or tanned and dressed, kangaroo, sheep and goat skins (including lamb and kid skins) dressed and finished, chamois and other skins and bookbinders' calfskins, all the foregoing not specially provided for in this act, twenty per centum ad valorem. * * *

In the revision of 1909 this is superseded by the following, which is part of the present paragraph:

Band, bend, or belting leather, rough leather, and sole leather, five per centum ad valorem; dressed upper and all other leather, calfskins tanned or tanned and dressed, kangaroo, sheep and goat skins (including lamb and kid skins) dressed and finished, other skins and bookbinders' calfskins, all the foregoing not specially provided for in this section, fifteen per centum ad valorem. * * *

It is contended that "rough leather" as used in the latter paragraph should be construed, a sociis, to mean leather no further finished than bands, bends, belting leather, and sole leather; and that such a construction is favored by the history of the legislation and by the context. It is contended that if such a definition were adopted it would include this importation.

Two answers to this contention suggest themselves:

First, the term "rough leather" had such a well-established, definite, and unmistakable trade meaning at and before the last enactment that no modification of this meaning by interpretation is permissible.

Second, as a matter of fact, appearing from the record and the exhibits, the importation is less like the 5 per cent class of leathers and more like the 15 per cent class in character and finish.

These considerations lead to the conclusion that the collector was correct in his classification; that the importation was not dutiable at 5 per cent ad valorem as rough leather, but was dutiable at 15 per cent ad valorem as leather not specially provided for in the section; and the decision of the board is therefore *reversed*.

MONTGOMERY, Presiding Judge, and SMITH, BARBER, and DE VRIES, Judges, concur.