(C. D. 1263)

Fleming-Joffe, Ltd. *v.* United States

United States Customs Court, First Division

(Decided August 1, 1950)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Richard F. Weeks* and *Jerome Vale*, special attorneys), for the defendant.

Before Oliver, Cole, and Mollison, Judges

Mollison, Judge: The merchandise involved in this case consists of an importation of snakeskins from India which were classified by the collector under the following provisions of paragraph 1530 (c) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1530 (c)):

Par. 1530.  *  *  *

*    *    *    *    *    *    *

(c) Leather  *  *  *  made from hides or skins of animals (including  *  *  * reptiles  *  *  *), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem;  *  *  *  any of the foregoing if imported to be used in the manufacture of boots, shoes, or footwear,  *  *  *  10 per centum ad valorem.

As to certain of the skins, the plaintiff complied with the applicable customs regulations establishing that they had been imported to be used in the manufacture of boots, shoes, or footwear, and the collector assessed duty on such skins at 10 per centum ad valorem. On the remainder, duty at the rate of 25 per centum ad valorem was assessed.

The protest claim is that all of the skins are entitled to free entry

under the provision in paragraph 1765 of the same act which provides for—

Skins of all kinds, raw, and hides not specially provided for.

Briefly stated, it is the plaintiff's contention that the skins in question had not been converted into leather prior to importation, but had merely been preserved for the purpose of transportation, and were in the raw state from a commercial standpoint. It is the defendant's contention that prior to importation the skins had been converted into leather in the rough or crust, or into partly finished leather.

There does not seem to be any dispute as to what actually had been done to the skins to bring them into the condition in which they were imported. According to the uncontradicted testimony of plaintiff's witness Shamsuddin, a dealer in hides, skins, wool, hair, and reptiles in the city of Calcutta, India, and who demonstrated considerable training and experience with whip snakeskins of the type here involved, whipsnakes are caught by natives in India, killed, and skinned. Salt is applied to the skins by the natives, who then bring their collections of skins to the central market for such skins in Calcutta. Because of the climate and the sensitiveness of the skin, it is essential that no more than 5 days elapse between the killing, salting, and selling of the skins to dealers in Calcutta; otherwise, the skins begin to rot and become worthless.

Those who purchase the skins in the market immediately put them into a lime bath, the purpose of which is to open the fibers of the skins. After staying in this bath for a day, they are removed and washed, presumably with water, and put into a bath containing avaram bark. The avaram bark solution has the property of penetrating immediately and preserves the skin by rendering the gelatinous matter unputrifiable. Mr. Shamsuddin emphasized that the avaram bark does not tan the skin but only changes the gelatinous matter into nonputrifiable matter for some period of time. After the bath in the avaram bark solution, the skins are oiled and hung up to dry. In this condition, represented by exhibit 1, received in evidence without objection on the trial, they are imported.

All of the witnesses who were interrogated on the subject, both those for the defendant as well as those for the plaintiff, stated that in the condition in which imported, the skins were not usable for leather purposes. It seems clear from the evidence given by plaintiff's witnesses, and not controverted by the defendant, that before the skins at bar can be commercially used for leather purposes they must be "wet back" in solutions which have the function of washing out the ingredients used in bringing them to their imported condition, after which they are given a complete tannage.

The situation of the snakeskins here involved is very like that which

obtained in the case of the preserved, raw, or pickled hides of cattle of the bovine species involved in *Rice & Co. Corp.* v. *United States*, 11 Cust. Ct. 118, C. D. 807. The hides in that case had been subjected prior to importation to a process the purpose and effect of which was to prevent deterioration during the period of sale and transportation but which did not tan or otherwise convert them into leather nor form the basis for further processes in this country which would convert them into leather.

In that case, the first division of this court, speaking through the late Judge Walker, said (p. 120):

Funk & Wagnalls New Standard Dictionary (1941) defines "leather" as follows:

The skin or hide of an animal, or any portion of such skin when tanned, tawed, or otherwise dressed for use; * * *.

This definition is somewhat broader than that given by the witnesses, who apparently limited their definition of leather to hides which had been tanned, while the dictionary definition includes hides which have been dressed by other means. However, it is to be noted that a prime requisite under both the witnesses' and the lexicographers' definitions is the element of use. There can be no question, from a reading of the testimony, that, as imported, the hides involved were not dressed or ready for use as leather. Those of the witnesses who were qualified to speak on the point testified that a process know as "stripping down" had to be applied to the imported articles in order to bring them back to the state in which they were prior to the application of the preserving process. * * *

The court then concluded that the articles were not leather within the meaning of the term as used in paragraph 1530 (b) of the tariff act and held they were entitled to classification under the provisions for "hides * * * raw or * * * pickled" in paragraph 1530 (a). Although the competition in that case was between a provision for "leather" and one for "Hides * * * raw or * * * pickled," while in the case at bar it is between a provision for "leather" and one for "skins of all kinds, raw," nevertheless, we think the reasoning in the case is particularly applicable to the facts and situation in the present case.

Certainly on the facts elicited in the present case the snakeskins are no more leather than were the hides in the *Rice & Co. Corp.* case, *supra*. In the brief filed on behalf of the plaintiff herein its counsel have cited the following definitions in addition to the Funk & Wagnalls New Standard Dictionary definition quoted above:

Webster's New International Dictionary (1933):

leather. 1. The skin of an animal, or some part of such skin, tanned, tawed, or otherwise dressed for use; also, dressed hides, collectively.

Dictionary of Leather Terminology, 4th ed., 1946 (published by Tanner's Council of America, Inc.):

Leather is the hide or skin of an animal or any portion of such skin when tanned, tawed, or otherwise dressed for use.

These definitions, as well as the testimony of the witnesses to the effect that the process to which the snakeskins in issue were subjected in India had no function in fitting them for use as leather, are convincing that the skins at bar were not made into leather and hence are not covered by the provision under which duty was assessed. We are, therefore, satisfied that the collector's classification of the skins as leather was erroneous.

It is vigorously contended by the defendant that the process to which the skins at bar had been subjected destroyed their identity as raw snakeskins and removed them from the category of raw skins. In this connection, there is cited the case of *Lord Tanning Co.* v. *United States*, 65 Treas. Dec. 959, T. D. 47100, and in the brief filed on behalf of the defendant an effort is made to demonstrate the similarity between the process which was applied to the snakeskins at bar prior to importation and the process which was applied to the India water-buffalo hides in the *Lord Tanning Co.* case, *supra*, after importation and which was held to convert the hides into leather.

Aside from any other differences which might have existed in the processes referred to, there is a vital difference in that in the case of the hides involved in the *Lord Tanning Co.* case, *supra*, a solution of chromium and salt, a well-known tanning solution, was used. The witnesses in the *Lord* case, referring to the hides which had been so treated, spoke of them as "leather" and as "chrome tan leather for mechanical use such as check straps and harness for textile machinery." As has been pointed out, the snakeskins at bar had no use as leather in the condition as imported and the process applied to them prior to importation did not form the basis for their conversion into leather in this country, i. e., it was not sufficient to convert them into leather in any degree.

In each of the other cases cited by the defendant in the brief filed in its behalf, viz, *United States* v. *Robertson*, 1 Ct. Cust. Appls. 379, T. D. 31458, and *Sherrard* v. *United States*, 3 Ct. Cust. Appls. 377, T. D. 32966, it appeared that the merchandise as imported had been converted into leather, albeit not finished leather. That is not the situation in the case at bar, wherein the skins had not been converted into leather at all.

The language of the free list paragraph under which claim is made, viz, "Skins of all kinds, raw" was the subject of an able opinion rendered by Judge Somerville of this court in the case of *In re Booth & Co. et al.*, 1 Treas. Dec. 589, T. D. 20884. That case involved pickled or salted sheepskins which, according to the opinion, had undergone the following processes prior to importation:

\* \* \* They are first limed, to remove the wool and hair, which is a mere depilatory process; this result may also be accomplished by sweating. After the wool is pulled, the skins are washed out and placed in a lime vat and allowed to remain for seven to twenty days; and on being taken out of the vat the lime is

removed or washed out by a bran bath or other solution. They are then trimmed and put on a wooden beam, and the superfluous flesh and other impurities are removed by the use of knives, called "skivers." When splitting is done, they are split by machinery. The skins are then placed in a pickle, which consists of a solution of salt in water containing sulphuric acid, and on removal from the pickle they are tied up in bundles, and are thus imported, ready for tanning. * * *

After thus describing the process to which the skins had been subjected prior to importation, the court went on to say:

* * * This pickling process is shown by the overwhelming weight of the evidence, even including that given by most of the Government witnesses, to be *designed purely for the purposes of preservation of the skins on their safe transportation to this country*; in other words, to prevent the articles from becoming putrescent. The witnesses all testified, moreover, that *before the skins can be tanned it is necessary that the salt and sulphuric acid contained in the pickle should be eliminated*, so as to reduce the skins as nearly as possible to their natural condition. This is usually effected by drenching the skins in a solution of lime water. In the condition in which they are imported, the great weight of the evidence shows that the skins can not be put to any practical use until they have been tanned or leathered, *except as raw material of the tanner*. [Italics quoted.]

After reviewing the contentions of the parties and pertinent authorities, the court concluded:

The evidence in the present cases is equally conclusive that all of the skins are sheepskins, being simply preserved in pickle for the purpose of preventing putrefaction and for convenience of transportation. The pickling is not tanning, nor is it part of the tanning process.

The purpose and effect of the processes to which the sheepskins involved in the *Booth* case, *supra*, and the snakeskins here involved were subjected were only to preserve the skins and to permit their safe transportation to this country, and neither process converted the skins into leather. We think the parallel between the condition of the snakeskins at bar and the sheepskins involved in the *Booth* case, *supra*, is so complete as to warrant following in this case the holding in the *Booth* case that such process did not change the character of the skins so as to remove them from the category of raw skins.

Before concluding our opinion in this case, we deem it pertinent to treat with some particularity a point raised in the brief filed on behalf of the defendant. This concerns a description of the involved merchandise made in an affidavit signed by one David B. Fleming, which is attached to the entry papers and bears the same date. The body of the affidavit is in the following language:

I, David B. Fleming, President of Fleming-Joffe, Ltd., do solemnly and truly declare that the leather described in the accompanying Enty [sic] #—— covered by sub-paragraph (C) of Paragraph 1530 of the Tariff Act of 1930, and entered at ten per centum ad valorem, is imported to be used in the manufacture of boots, shoes, or footwear or cut or wholly or partly manufactured in to upper vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear.

It is, of course, obvious that the aforementioned affidavit was filed in compliance with section 10.84 of the Customs Regulations of 1943,

prescribing the conditions under which leather of the kinds provided for at the rate of 25 per centum ad valorem in paragraph 1530 (c), *supra*, may be admitted. One of such conditions is stated in subsection (*1*) of said section as follows:

(*1*) An affidavit of the importer that the leather is imported to be used in the manufacture of boots, shoes, or other footwear shall be filed in connection with the entry. In the case of merchandise entered for warehouse, such affidavit may be filed at the time of withdrawal, provided the declared intent existed at the time of importation.

In the brief filed on behalf of the defendant the following from the opinion of the Court of Customs and Patent Appeals in the case of *United States* v. *Rockhill & Vietor et al.*, 10 Ct. Cust. Appls. 112, T. D. 38374, is quoted:

\* \* \* In deciding this we must first observe that the invoices described the article as hardened fish oil, and furthermore that the importers entered it for duty under a similar description. In the absence of explanation these facts are certainly entitled to substantial weight in the decision of the present question. It is true that the invoice descriptions of merchandise are generally, perhaps always, open to explanation and contradiction, both by the Government and the importers; nevertheless, a statement against interest made by importers in their invoices and entries certainly establishes a prima facie case against any contradictory claim made by them in their protest. \* \* \*

It is argued that the reference in the affidavit quoted above to the invoiced merchandise as "leather" constituted an admission against interest on the part of the importer, and as such is entitled to substantial evidentiary weight.

In reply, counsel for the plaintiff points out that the regulation prescribes the use of the word "leather" and that, unless the prescribed form was used, the benefit of the regulation and the statutory privilege would be lost.

Without considering the element of duress under administrative compulsion in the use of the term, however, we think the record made at the trial clearly disproves the correctness of the admission, if such it be. As was said in *United States* v. *Wo Kee & Co.*, 21 C. C. P. A. 341, T. D. 46880, at p. 344:

\* \* \* When such admissions are contradicted by a protest, however, the importer is not precluded from disproving the correctness of such description.

In this case the description contained in the affidavit was contradicted by the protest, and the plaintiff was not precluded from disproving the correctness of the affidavit description and showing the true character of the merchandise. See also *United States* v. *Paul Puttmann*, 21 C. C. P. A. 135, T. D. 46466.

On the record made in this case we sustain the protest claim for free entry of the involved snakeskins under the provisions of paragraph 1765 of the Tariff Act of 1930, and judgment will issue accordingly.