(C. D. 1904)

N AWI N OONOO & C O. ET AL. *v.* U NITED S TATES

United States Customs Court, First Division

(Decided July 31, 1957)

*Barnes, Richardson & Colburn* and *Strauss & Hedges* (*Edward N. Glad* and *Hadley S. King* of counsel); *Siegel, Mandell & Davidson* (*Joshua M. Davidson* of counsel), associate counsel; for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Joseph E. Weil*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar covers certain sheepskins and goatskins imported from Iraq, Iran, Lebanon, and Syria, which were classified under paragraph 1530 (c) of the Tariff Act of 1930 at the rate of 10 per centum ad valorem as "vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins)." Plaintiffs contend that said merchandise should be held properly free of duty under paragraph 1765 of the act as "Skins of all kinds, raw, and hides not specially provided for."

At a pretrial conference, the following facts were stipulated between counsel for the respective parties and approved by the court:

1) Counsel for the plaintiffs moved to abandon entry No. 34934 under protest 121594–K, and an order was entered directing the dismissal of the protest above referred to, pursuant to said abandonment [as to said entry No. 34934 only].

2) A piece of goat skin, marked as plaintiffs' exhibit 1, was received in evidence, as representative of all the goat skins involved in all the protests covering goat skins, regardless of the country of origin.

3) A piece of sheep skin, marked plaintiffs' exhibit 2, was received in evidence as representative of all the sheep skins involved in the protests now under consideration without regard to the countries from which exported.

4) Whatever treatment was given to the merchandise constituting the subject matter of these protests, and wheresoever such treatment was given, all of such merchandise, whether consisting of sheep skins or goat skins, was imported in the condition shown by plaintiffs' exhibits 1 and 2.

A sample of vegetable-tanned rough leather was received in evidence as plaintiffs' illustrative exhibit 3. In addition, a small piece, cut from illustrative exhibit 3, was received in evidence as plaintiffs' exhibit 3–A, and a small piece, cut from exhibit 1, was used in evidence as plaintiffs' exhibit 1–A.

The sole question for determination herein is whether the imported goatskins and sheepskins are dutiable as vegetable-tanned rough leather, as classified by the collector, or whether they are raw skins and properly classifiable, as such, as claimed by the importers.

All of the testimony in this case was adduced on behalf of the plaintiffs, who called three witnesses. The first of these was Mr. Maurice Shasha, Bagdad, Iraq, for 20 years an exporter of wool and skins. He testified that he had handled merchandise, such as plaintiffs' exhibits 1 and 2, all during that period; that he was familiar with the market in Bagdad as to merchandise like that here involved, having exported merchandise of that character; that he personally had seen how such skins are prepared for exportation to the United States; and that he had prepared skins such as plaintiffs' exhibits 1 and 2 in his own tannery. The witness described the process used to put plaintiffs' exhibits 1 and 2 in their condition as here imported substantially as follows:

The skins are placed in vats in the ground, usually 150 goatskins or 175 sheepskins per vat being processed at one time. The skins are first placed in lime and water for 20 days, to remove the hair from them, and then are put in a vat, containing about three 5-gallon cans of dog manure, after which they are put in a solution of flour, barley, and water, where they remain for about 5 to 7 days. The pelts are then placed in a solution of 15 kilos of dates, mixed with water, for 5 days, when they are placed in another solution of gall nuts and salt for 3 days, after which period they are dried in a covered place and packed (R. 10). Plaintiffs' witness testified that the purpose of using the dates and salt in the above-described process is to preserve the skins and prevent spoilage and decay.

On cross-examination, Mr. Shasha testified that he did not know whether dates contain tannic acid nor whether dates and gall nuts contain a tanning agent. In fact, he stated that he did not know what tannic acid or tannin is (R. 17). The witness expressed the opinion that while the skins under consideration are locally called "semi-tanned" skins, in order to get a better price for them, they are not, in fact, "semi-tanned." Mr. Shasha admitted he did not know whether or not the use of lime to remove the hair, and the use of dog manure, barley, water, dates, gall nuts, and salt tanned the skins (R. 23).

Bernard Goldsmith, plaintiffs' second witness, who had been engaged with his father, and on his own account, in the leather manufacturing business since 1916, testified that he has tanned sheepskins, goatskins, kangaroo skins, snakes, reptiles, alligators, sharks, and frog skins, and that he has handled "India tans" (R. 24). Further, he stated that, as a contract tanner, he had converted skins similar to plaintiffs' exhibits 1 and 2 into leather, off and on for 20 years, and that he has handled hundreds of thousands of such skins. Mr. Goldsmith, after explaining the processes used to convert raw skins into leather, testified further concerning the treatment in this country of skins, such as plaintiffs' exhibits 1 and 2, before such merchandise is

converted into leather ready for use, as follows: The first operation performed is to wash out the dried preservative in a drum with warm water, so as to bring back the cleansed raw skin, after which the skins are fleshed. From that point, the skins are subjected to the full tanning process, at the conclusion of which, he stated, the skins have become leather. The witness stated that, in his opinion, the imported skins have been flayed and lightly fleshed, but that they are not what would be properly termed in this country "fleshed" (R. 29).

Mr. Goldsmith testified that he had never seen any merchandise in the condition of plaintiffs' exhibits 1 and 2 being used for anything in the condition, as imported, and that such skins in the condition imported are not leather (R. 48), because the tanning to which they are subjected has not penetrated the entire skin sufficiently to turn them into leather (R. 52). The witness further testified that skins in the condition of plaintiffs' exhibits 1 and 2 are not vegetable-tanned rough leather (R. 55) and are nothing more than raw skins, preserved (R. 36).

Plaintiffs' last witness was Harold J. Smith of Gloversville, N. Y., a leather merchant, who, the record discloses, started in the leather business with his father in 1915. Such materials, Mr. Smith stated, are made into glove, garment, shoe, bag, and novelty leathers. The record further discloses that Mr. Smith first purchased skins like plaintiffs' exhibits 1 and 2 in the early 1930's, but that he did not start handling such skins in regular quantities until the early 1940's, when the World War II created a demand for leather. The witness testified that he experimented at that time for about a year, in order to determine how to convert or tan such skins into leather, and that, after spoiling many hundreds of dozens of skins, he finally succeeded in finding a method to tan the skins. He further stated that he regularly purchases skins, such as plaintiffs' exhibits 1 and 2, from practically all of the importers of this type of merchandise.

Mr. Smith further stated that skins, such as plaintiffs' exhibits 1 and 2, are not vegetable-tanned rough leather, "because they haven't been tanned" (R. 64), and that, to convert such skins into leather, a further processing with tanning agents, which the witness described as the "chrome-tanning process," wherein the tanning substance completely penetrates the skins, is necessary, all of which operation takes quite a number of hours (R. 64–67). In his opinion, a skin to be "tanned" must be completely penetrated by tanning agents. Plaintiffs' witness further stated that he had subjected skins, such as plaintiffs' exhibits 1 and 2, to a vegetable tanning process many times and that such process was usually one wherein a quebracho, or some other form of tanning material, was employed (R. 70–71). He further testified that, in such operation, the washing or pickling process was for the purpose of removing all the preservatives out of the skins

(R. 72). Referring to plaintiffs' exhibits 1 and 2, Mr. Smith testified that, if they were allowed to get wet, they would decompose (R. 75).

On cross-examination, Mr. Smith testified that whatever is put in skins, such as plaintiffs' exhibits 1 and 2, is merely put in as a preservative and that, before such merchandise could be made into rough leather for salable purposes, it would have to have a complete tanning process, with complete penetration of the tanning agent, otherwise the leather would be worthless (R. 87–88). He further testified that while he had known merchandise, like plaintiffs' exhibits 1 and 2, to be invoiced as "tanned sheepskins," it was not, in fact, "tanned" leather but just raw material containing some materials to put it in condition for preservation. The witness concluded by testifying that plaintiffs' exhibits 1 and 2 were not vegetable-tanned rough leather but were raw skins (R. 90).

The issue in the case at bar is whether the sheepskins and goatskins here involved are classifiable under the provisions of paragraph 1530 (c) of the Tariff Act of 1930 as "vegetable-tanned rough leather made from goat or sheep skins." It is the contention of the plaintiffs that the goatskins and sheepskins at bar are nothing more than raw skins, which were subjected to certain crude treatments in their countries of origin, sufficient only for their preservation while being transported, and which have not reached the status of rough leather. Prior cases, involving the question of what constitutes "rough" leather and "leather" and the meaning of "tanning," as applied to skins, have been before this and our appellate court, some of the decisions concerning which we deem pertinent to refer to at this juncture.

In *United States* v. *Robertson*, 1 Ct. Cust. Appls. 379, 380, T. D. 31458, in construing the provisions of paragraph 451 of the Tariff Act of 1909, the court gave the following definition:

Rough leather, as understood by the trade, was such leather as had been tanned and unhaired, and not given any further finishing treatment. It was thus contra-distinguished from dressed or finished leather.

The first process, generally stated, in the treatment of hides is to tan them, which also includes unhairing them. Before the hides are tanned they are not called leather at all; when they are once tanned they become leather. When only tanned and unhaired they are rough leather. When such leather is afterwards finished and dressed by other processes it ceases to be rough leather. This finishing process is generally called currying, and in brief and general terms it may be said that the hides leave the tanner and come to the currier as rough leather, and leave the currier as finished or dressed leather.

Again, in *Sherrard* v. *United States*, 3 Ct. Cust. Appls. 377, 378, T. D. 32966, in discussing the provisions of the Tariff Act of 1909, our appellate court stated:

* * * Rough leather within the meaning of paragraph 451 is such as is tanned only, and not dressed or finished.

As to what constitutes "leather" and the process employed to make it so, the court, in *Stern* v. *United States*, 14 Ct. Cust. Appls. 36, 37, T. D. 41547, stated:

> Leather is made by tanning skins or otherwise dressing them for use, for the purpose, principally, of overcoming the tendency to putrefaction, securing suppleness in the material, rendering it impervious to and unalterable by water, and increasing its strength and its power to resist wear and tear. Encyclopedia Britannica and Webster's New International Dictionary.
>
> Various methods may be employed to produce these results but we have no doubt there is, in common understanding, a different meaning attaching to the word "leather" and the word "skin." * * *

In *Rice & Co. Corp.* v. *United States*, 11 Cust. Ct. 118, C. D. 807, certain merchandise, described as "East India Partially Tanned Cow Hides," classified under paragraph 1530 (b) (4) of the Tariff Act of 1930 for "leather made from * * * kip skins * * *," was held properly dutiable under paragraph 1530 (a) of the same act as "Hides and skins of cattle of the bovine species * * * raw or uncured, or dried, salted, or pickled * * *." From the testimony of the witnesses, it appeared that the articles under consideration were subjected to some treatment in the country from which exported, one witness stating on this point, page 119–120, as follows:

> * * * That hide is preserved in India for the purpose of making it commercially salable, and to allow them to ship it. It is just one of the methods of getting hides out of a hot country like India. * * * the English developed this process of preservation, and by preservation, I mean they took the hair off, and just fleshed it. Those are the only operations they have done, and then preserved it. * * *

The court, in the *Rice & Co. Corp.* case, *supra*, page 120, observed as follows:

> Funk & Wagnalls New Standard Dictionary (1941) defines "leather" as follows:
>> The skin or hide of an animal, or any portion of such skin when tanned, tawed, or otherwise dressed for use; * * *.
>
> * * * However, it is to be noted that a prime requisite under both the witnesses' and the lexicographers' definitions is the element of use. There can be no question, from a reading of the testimony, that, as imported, the hides involved were not dressed or ready for use as leather. Those of the witnesses who were qualified, to speak on the point testified that a process known as "stripping down" had to be applied to the imported articles in order to bring them back to the state in which they were prior to the application of the preserving process. * * *
>
> \*      \*      \*      \*      \*      \*      \*      \*
>
> The testimony that the process applied in India merely preserved the hides from deteriorating during sale and shipment is uncontradicted. It clearly appears that such process could not form the basis for further processes in this country which would convert the hides into leather. * * *

The court, in the cited case, *supra*, cited *Causse Manufacturing Co.* v. *United States*, 12 Treas. Dec. 122, T. D. 27513, and then, at page 121, stated:

The analogy between that case and the case at bar is very close. There, as here, the preservative was a protection from deterioration, and did not affect the character of the article *per se*, leaving it in its original condition when removed and not advancing it along the line toward its ultimate use.

In *Fleming-Joffe, Ltd.* v. *United States*, 25 Cust. Ct. 56, C. D. 1263, merchandise, consisting of certain snakeskins, was classified under paragraph 1530 (c), Tariff Act of 1930, as "Leather * * * made from hides or skins of animals * * * in the rough, in the white, crust, or russet, partly finished, or finished * * *" and claimed free of duty under paragraph 1765 of the same act as "Skins of all kinds, raw, and hides not specially provided for." Plaintiff contended therein that the skins in question had not been converted into "leather" prior to importation, but had merely been preserved for the purpose of transportation, and were in the raw state from a commercial standpoint. The Government contended the skins had been converted into leather in the "rough" or crust, or into partly finished leather. All of the witnesses, both those for the plaintiff as well as for the defendant, stated that, in the condition in which imported, the skins were not usable for leather purposes.

In its decision, the court, in the *Fleming-Joffe, Ltd.*, case, *supra*, page 57, stated:

* * * It seems clear from the evidence given by plaintiff's witnesses, and not controverted by the defendant, that before the skins at bar can be commercially used for leather purposes they must be "wet back" in solutions which have the function of washing out the ingredients used in bringing them to their imported condition, after which they are given a complete tannage.

In upholding the claim for free entry of the involved merchandise under paragraph 1765 of the act as raw skins, the court, in the *Fleming-Joffe, Ltd.*, case, *supra*, held the situation there involved was very much like that which obtained in the *Rice & Co. Corp.* case, *supra*.

It appears from the testimony in this case that, to convert skins such as those at bar into rough leather, it is necessary to put them through a so-called "fat liquoring" process, and that the imported skins had not been subjected to such treatment prior to importation. Further, the uncontradicted testimony of plaintiffs' well-qualified witnesses establishes, in our opinion, that the involved skins in the condition as imported are not leather, inasmuch as they have not had that complete penetration of tanning agents which is necessary to convert them into leather; that the treatment to which the imported skins had been subjected was merely for purposes of preservation of the skins in shipment; and that, in the condition as imported, the skins are nothing more than raw skins. In this connection, the record establishes that, in converting the imported skins into leather, the dried preservatives placed thereon prior to importation are washed out so as to bring back these skins to the cleansed raw skin state,

after which the skins are fleshed and a complete tanning process then started.

The factual situation in this case appears analogous to that in the *Rice & Co. Corp.* and *Fleming-Joffe, Ltd.*, cases, *supra*, and, in our opinion, the principles enunciated in those cases are applicable and controlling in the determination of the present issue. In their condition as imported, the involved skins, not having been converted into leather and not being usable for leather purposes, have not reached the stage of vegetable-tanned rough leather, but, being merely treated to the extent necessary to prevent decay or putrefaction, are, for tariff purposes, raw skins. On the basis of the record here presented, we are of opinion and hold that the imported skins, with the exception of those covered by entry No. 34934 under protest 121594–K herein, as to which the protest claim has been dismissed, are properly free of duty under the provisions of paragraph 1765 of the Tariff Act of 1930 as "Skins of all kinds, raw * * * not specially provided for," as claimed. The protest claim as to the merchandise covered by the involved entries is sustained. Judgment will be entered accordingly.