LOEWENGART & COMPANY *v.* UNITED STATES (No. 5155)*

United States Court of Customs and Patent Appeals, June 16, 1966

*Siegel, Mandell & Davidson* (*David Serko, Murray Sklaroff*, of counsel) for appellant.

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Mollie Strum* for the United States.

*Eugene F. Blauvelt, amicus curiae.*

[Oral argument November 1, 1965, by Mr. Serko, Miss Strum, and Mr. Blauvelt, amicus curiae]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Associate Judges

Worley, Chief Judge, delivered the opinion of the court:

Loewengart, importer of several shipments of goatskins from India, appeals from the judgment of the Customs Court, 51 Cust. Ct. 1, C.D. 2405, overruling its protest against the collector's classification of the goods under paragraph 1530(c) of the Tariff Act of 1930 as "vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins)," dutiable at 10 per centum advalorem. The protest claimed classification

---

*C.A.D. 880.

under the free provisions of paragraph 1765 as "Skins of all kinds, raw, and hides not specially provided for."[1]

The pertinent portions of the paragraphs read:

Paragraph 1530(c):

* * *; vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins), 10 per centum ad valorem; * * *.

Paragraph 1765:

Skins of all kinds, raw, and hides not specially provided for.

As representative of the goatskins, appellant introduced Exhibits 1-A, 1-B and 2 in evidence.

The processing of the skins prior to exportation from India was described by one of appellant's witnesses, Wahid, substantially as follows: On being stripped from the carcass the skins are immediately salted to prevent putrefaction; taken to a tannery and water-soaked overnight to remove the salt, dirt and blood; then placed in pits in a solution of lime for three days to loosen the hair. During that period the skins are manipulated so that the lime penetrates all parts of the skins, then removed from the pits to beams where the hair is removed with a blunt knife. After dehairing, the skins are again placed in lime pits for plumping to loosen the flesh and left there from seven to nine days, then again put on beams where the flesh is removed with a blunt knife (fleshing), after which they are "scudded," i.e., thoroughly washed to remove any remaining dirt or lime. Then, in groups of 70 to 100, the skins are treated in a cold water bark pit. Each layer placed in the pit is sprinkled with avaram bark, another layer added and the steps repeated, and left in the pits for sixteen days. Upon completion of the treatment with avaram bark, the skins are dehydrated by placing them on beams and removing the water, then put in tubs and covered with a solution of water and powdered myrobalam nut powder, 0.27 of a pound of powdered nut being used per pound of estimated dry weight of the skins. They remain there for three days, then placed on beams where they are first dehydrated, then oiled. After oiling, the skins are dried, flattened with a blunt knife, sorted into groups according to quality, folded and baled.

Both parties introduced testimony of several witnesses which the Customs Court summarized as follows:

* * * In substance, the witnesses for the plaintiff testified that, although the merchandise before the court is commercially known as India-tanned goatskins, yet, it is not vegetable-tanned rough leather, but still raw hides or skins. The reason given by plaintiff's witnesses for this opinion is that the processes to which the skins were subjected in India before exportation consisted only of

[1] Appellant's alternate claim for classification under paragraph 1558 is not properly before use and will not be considered. *U.S. Wolfson Bros. Corp.* v. *United States,* 52 CCPA 46, C.A.D. 856.

such treatment as was essential for the preservation of the merchandise for transportation to the United States; that the tanning procedures followed in the treatment of the skins served only to preserve them and not to tan or convert them permanently into leather. The witnesses stated that the India-tanned goatskins in this case, in their imported condition, were not usable as leather, but that they had to be "stripped," so as to remove therefrom all the materials which had been applied to them before their shipment from India, and that such stripping was for the purpose and had the effect of returning these skins to a completely raw state, and that, from said raw state, they were tanned into leather in this country. On the other hand, the defendant's witnesses testified definitely that the imported skins consisted of India-tanned goatskins, which had been converted into rough leather, and that the tanned skins could not, by the stripping process described by plaintiff's witnesses, be returned to the raw state. Without exception, defendant's witnesses testified that the treatment to which the goatskins were subjected in India constituted a definite tanning process, by which the skins were permanently converted into rough leather, and was not, as stated by plaintiff's witnesses, a mere preservative process having no permanent effect on the skins.

The Customs Court was of the opinion that the exhibits introduced as representative of the India-tanned goatskins at bar "clearly have the appearance of leather and not that of raw skins." It regarded those exhibits as supporting the testimony of the Government rather than that of the importer. The court concluded that the importer had failed to prove the imports were raw skins and that "the evidence, taken as a whole, by great preponderance, supports the collector's classification of the India-tanned goatskins * * *."

As "an additional persuasive reason for finding that the India-tanned goatskins involved are properly classifiable under paragraph 1530(c) of the tariff act, whether rough leather or not," the court found the legislative history to indicate that Congress intended specifically to place goatskins commerically known as India-tanned goatskins under the portion of paragraph 1530(c) involved here.

We find no error in that conclusion. In the first place, we agree that Exhibits 1-A, 1-B and 2 clearly have the appearance of leather rather than raw skins. Those exhibits, when taken with the testimony of record and the examples of untanned goatskins introduced by the Government, constitute potent witnesses in support of the collector's classification. *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676; *Coro, Inc.* v. *United States*, 41 CCPA 215, C.A.D. 554.

Although appellant's witnesses testified in substance that the vegetable tanning process to which the imported goatskins were subjected constituted only a preservation process and did not convert the skins permanently to rough leather, the weight of the evidence is clearly on the side of the Government's witnesses that the treatment did permanently convert the skins into rough leather. Dr. Holloway, a Government witness described by the trial court as "outstanding in his qualifications as an expert on the questions of tanning and leather,"

testified that vegetable tanning materials have a common ingredient, tannin, which is used to convert raw skins into leather. He further stated:

\* \* \* there are a number of ways that one can see the change. If one has a piece of leather to look at, as compared to the raw skin, one sees, first, that the hair is removed; one, that it has a grain on it; second, that the leather now has become supple—it has a certain elongation to it that it does not have as a raw skin. It has a stretch to it that it does not have as a raw skin. It also, in the case of vegetable leather, if we work it mechanically, it has a squeak, which raw skin does not have.

The witnesses for both parties agreed that avaram bark and myrobalam nuts, both of which were used in processing the imported goatskins, are tanning materials.

Dr. Holloway also testified as to two particular tests used by chemists and leather technicians to evaluate the effect tannin has on skins. One test involves determining the shrinkage temperature of the treated material and the other the degree of tannage. He performed both tests on sections cut from each of the representative samples, Exhibits 1–A, 1–B and 2, and in each case obtained results which he regarded as demonstrating that the material had been converted into leather. On the basis of those tests and a physical examination of the samples, he expressed the unqualified opinion that they were all vegetable-tanned rough leather rather than raw skins.

Goldsmith, a Government witness who has had his own tannery since 1930, also tested the representative samples 1–A, 1–B and 2 in addition to subjecting them to a physical examination. The tests, one used in his tannery for determining whether a skin is vegetable-tanned leather, involved cutting through each of the three samples to see if there were any raw skin, which would show up as a white streak between the two outer layers. He found no such streak in any of the samples and expressed the opinion that they were vegetable-tanned rough leather.

Appellant argues that the controlling issue is whether the imported goatskins are rough leather, and that testimony concerning the tanning process to which they were subjected in India cannot, "in and of itself," establish that they fall in that category for tariff purposes. Accepting the proposition that the specific issue is whether the imported India-tanned goatskins are rough leather rather than how they were treated before exportation, we are satisfied that the evidence based on inspection and tests of the representative samples clearly supports the finding that they are rough leather. That conclusion is not inconsistent with the fact that the importations are ordinarily subjected to a stripping process in an alkaline solution after entry in this country and are further tanned before final use. It is clear from the evidence that the stripping process cannot restore the skins

to their condition prior to tanning in India. Dr. Holloway testified, along with others, that the India-tanning process is not reversible. He further testified that he stripped a sample of an India-tanned goatskin, obtained from the instant importer, with similar goods undergoing a commercial stripping operation and found that, after stripping, the sample gave results in degree of tannage and shrinkage temperature tests which showed it to still constitute leather. Thus the stripped sample still had combined tannin at the ratio of over 64 pounds of tannin per 100 pounds of hide substance, and shrinkage temperature of the same order as the unstripped goatskins introduced in evidence by appellant as representative of the importations.

Moreover, there is evidence that India-tanned goatskins are not always further tanned before use. One Harry Fleisch, a Government witness experienced in the leather and tanning field, testified that a lacing for use in the handicraft trade is made in commercial quantities from India-tanned goatskins without additional tanning. He also stated that his company makes substantial quantities of goatskins used for linings by a process of plating and coating without further tanning. While appellant points out that one of its witnesses testified that his company sells those of the skins it buys which are too low in quality to warrant additional work on them for articles like the laces, that testimony confirms the testimony that leather laces can be made directly from the goatskins in question without further tanning.

Quite apart from whether testimony relative to the treatment of the skins in India can "in and of itself establish" their tariff classification, the testimony here on that point supplies substantial corroboration of the previous discussed evidence that the skins are vegetable-tanned rough leather. Thus the witnesses Holloway, Fleisch and Goldsmith all testified that, in their opinions as experts, goatskins subjected to the processes described by Wahid as having been applied to the imported skins would be converted into vegetable-tanned rough leather.

In its brief, appellant refers to a definition of leather from Webster's New International Dictionary, Second Edition, unabridged, 1956, and a description of rough leather by the predecessor of this court in *United States* v. *Robertson*, 1 Ct. Cust. Appls. 379, T.D. 31458, both cited below. The former reads:

Leather * * * The skin of an animal, or some part of such skin, tanned, tawed, or otherwise dressed for use, to render it resistant to putrefaction and relatively soft and flexible when dry; also, dressed hides, collectively.

The excerpt from *Robertson* reads:

Rough leather, as understood by the trade, was such leather as had been tanned and unhaired, and not given any further finishing treatment. It was thus contradistinguished from dressed or finished leather.

The first process, generally stated, in the treatment of hides is to tan them, which also includes unhairing them. Before the hides are tanned they are not called leather at all; when they are once tanned they become leather. When only tanned and unhaired they are rough leather. When such leather is afterwards finished and dressed by other processes, it ceases to be rough leather.

Appellant regards those definitions as requiring that rough leather must be tanned to the point where it is ready for finishing and dressing without further tanning. However, we think the definitions clearly include skins which have been dehaired and so tanned as to have the properties of leather, as the record demonstrates is the case with the present India-tanned goatskins, irrespective whether they may ordinarily be stripped and further tanned to produce the most common finished products. Moreover, the fact that the India-tanned goatskins can be made into lacing for the handicraft trade and linings without additional tanning further demonstrates that they fall within the interpretation of the definitions urged by appellant.

Since appellant takes issue with the Customs Court's holding that the legislative history of paragraph 1530(c) of the Tariff Act of 1930 shows Congress "intended specifically to place goatskins, commercially known as India-tanned goatskins" under that paragraph, the basis for that holding will be considered briefly. The House of Representatives first passed H.R. 2667, containing the following paragraph:

[Par. 1530(c)]. Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem * * *.

Subsequently one Louis M. Musliner testified as a representative of a committee of fancy leather tanners before the Senate Finance Committee, asking that the rate of duty of 25 per centum in the House bill be reduced to 10 per centum for "India tanned goat and sheep skins." He requested the bill be amended to include the following:

* * * vegetable-tanned rough leather made from goat and sheep skins (including those commercially known as India-tanned goat and sheep skins) * * * 10 per centum ad valorem.

The Fancy Leather Tanners also submitted a brief to the Committee stating that paragraph 1530(c), "as worded in the present bill, places a duty of 25 per cent on vegetable-rough-tanned goat and sheep skins, which are commercially known in the tanning trade as India-tanned goat and sheep skins." The fact that the language so proposed was included in paragraph 1530(c) of the Tariff Act of 1930 as finally enacted was the reason for the Customs Court's finding that Congress intended to include "goatskins, commercially known as India-tanned goat[skins]" in that paragraph.

84

Appellant urges that "such 'legislative history' cannot be controlling of a provision which in unambiguous and clear terms provides for 'rough leather' and not merely for certain skins, whether or not they are rough leather." In support it relies on, and quotes at length from, *United States* v. *Kung Chen Fur Corporation*, 38 CCPA 107, C.A.D. 447.

Despite appellant's arguments we are satisfied that the legislative history supports the position of the Customs Court. The *Kung Chen* case turned on findings that recourse to legislative intent was not in order because the statutory provision under consideration was not ambiguous. Here appellant itself raises the question of ambiguity in paragraph 1530(c) by urging that the word "those" in the parenthetical expression can refer only to the plural noun "skins" in the term "vegetable-tanned rough leather made from goat or sheep skins." Although that contention seems to be answered logically by the argument [2] that "leather" is defined as plural as well as singular and is used in a plural or collective sense in the various leather provisions in the Tariff Act of 1930, the ambiguity is not completely resolved by that argument.

In *Kung Chen*, the court also considered the legislative history of the tariff provision there involved but did not find it controlling. However, it is our opinion that the facts in that case, as well as those involved in various decisions cited therein, were not as convincing as those here. Indeed, the document most relied on as evidence of Congressional intent in *Kung Chen* was itself characterized by the court as ambiguous.

On the instant record we are unable to agree with appellant that the Customs Court erred in its evaluation of the evidence supporting the judgment appealed from. Accordingly, that judgment is *affirmed*.

---

[2] The argument is set out in detail in the brief of Amicus Curiae.
*C.A.D. 881.